985 A.2d 783

COMMONWEALTH of Pennsylvania, Appellee

v.

Bryan Sean GALVIN, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 6, 2008.

Decided Dec. 28, 2009.

626

628

Timothy Alan Biltcliff, Berks County Public Defender's Office, Kutztown, for Bryan Sean Galvin.

Mark Carlyle Baldwin, Berks County District Attorney's Office, Harrisburg, Kelley Lynn Nelson, PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice TODD.

Bryan Sean Galvin appeals the judgment of sentence of death imposed by the Court of Common Pleas of Berks County on September 6, 2007, following a jury trial. The jury

convicted Appellant of first-degree murder,[1] abuse of a corpse,[2] tampering with or fabricating physical evidence,[3] theft by unlawful taking or disposition,[4] receiving stolen property,[5] and unauthorized use of automobile and other vehicles.[6] Additionally, the trial court found Appellant guilty of the summary offenses of driving without lights to avoid identification or arrest[7] and periods for requiring lighted lamps.[8] For the reasons offered below, we find the issues raised by Appellant are without merit. Thus, we affirm the convictions and judgment of sentence.

The evidence of record establishes the following facts. At approximately 3:00 a.m. on January 31, 2006, Officer Nicholas Hine, Sr. of the Cumru Township Police Department, on patrol in the Borough of Kenhorst, Berks County, Pennsylvania,[9] observed a maroon 1988 Ford Aerostar van travelling on New Holland Road. The van was heading toward Nolde Forest, a wooded public park and operating without its headlights illuminated. Based upon this violation of the Motor Vehicle Code, Officer Hine activated his overhead lights in an attempt to stop the van. The van made numerous evasive turns through the streets and alleyways of Kenhorst before ultimately coming to a stop.

An individual, later identified through his driver's license as Appellant, exited the van, and walked toward Officer Hine's patrol car. After being ordered twice to return to his vehicle, Appellant returned to the van. Officer Hine radioed for assistance. While waiting for the backup officers to arrive, Officer Hine observed through the window of the van what

1. 18 Pa.C.S.A. § 2502(a).
2. 18 Pa.C.S.A. § 5510.
3. 18 Pa.C.S.A. § 4910(1).
4. 18 Pa.C.S.A. § 3921(a).
5. 18 Pa.C.S.A. § 3925(a).
6. 18 Pa.C.S.A. § 3928(a).
7. 75 Pa.C.S.A. § 3734.
8. 75 Pa.C.S.A. § 4302(a)(1).
9. Cumru Township provides police protection to the Borough of Kenhorst, which does not have its own police department.

appeared to be a human leg with a peace sign tattooed on the skin, with a white sneaker on the foot. After observing this body, Officer Hine instructed Appellant, through the P.A. system of his patrol car, for Appellant to turn off the engine of the van and throw the key out of the window with his left hand. The key was on a ring with a "Jello" key fob. Officer Hine also noticed that a piece of plastic was broken off of the van's bumper. Shortly thereafter, Officer Hine was joined by Sergeant Scott Bechtel and Officer James Griffith.

As the officers approached the van, Sergeant Bechtel observed a large, approximately 400-pound white male, later determined to be Kristofer Kolesnik, lying in the back of the van. Kolesnik was wrapped in a large white sheet or tarp which was tied with yellow electrical cord. There appeared to be blood on Kolesnik's chest and on the sheet, and he did not appear to be breathing. After directing Appellant to exit the vehicle and lie on the ground, Officer Hine asked if there was anyone else in the van, to which Appellant responded, "just a dead guy," or "only the dead guy." N.T., 8/6/07, at 59, 106. Subsequently, EMS personnel who were summoned to the scene confirmed Kolesnik was not breathing and had no heartbeat, and determined that he was dead.

Also at this time, Officer Hine and Sergeant Bechtel observed a red gasoline can placed on the front passenger seat, which was later determined to be full of gasoline. Additionally, Sergeant Bechtel saw a Motorola cellular telephone lying in the center console of the van. After Appellant was taken into custody, Sergeant Bechtel noticed blood on Appellant's pant leg, boot, wrist watch, and glasses. The officers transported Appellant to the Cumru Township Police Department. There, Appellant was placed in a holding cell and instructed not to wash his hands in the sink. Later, however, Appellant was observed by a surveillance camera, dunking his hands into the toilet bowel and rubbing them together.

Through Appellant's driver's license, the police were able to obtain the address of Appellant's residence—312 South 18th Street, Reading, Pennsylvania. Investigators were dispatched to Appellant's residence to search for pieces of broken bumper

from the van, which had been impounded after the removal of the victim's body. Upon his arrival at Appellant's residence, Sergeant Guy Lehman of the Reading Police Department observed fresh blood leading from the sidewalk to the front door of the residence, and a wooden broom with blood on it, on the sidewalk. Based upon his observation of what he believed to be fresh blood spread across the front of the residence,[10] and his fear that there may have been other victims inside the residence who may require medical attention, Sergeant Lehman called for assistance and determined that it was prudent to conduct a security check of the residence.

Thereafter, Criminal Investigators William Strickler and Andrew Shearer arrived at Appellant's residence. Investigator Strickler knocked on the front door of the residence. Initially, there was no response. After knocking a second time, Investigator Strickler heard a faint muffled voice coming from inside the residence. Investigator Strickler pushed open the front door, and three officers entered the residence. The officers proceeded room-by-room in search of individuals in the apartment. The officers checked a living room, a kitchen, a rear bathroom, and a bedroom where they encountered William Galvin, Appellant's father, who was lying on a bed. Appellant's father was not injured or in need of medical care. The officers explained why they were in the apartment, gave him an opportunity to dress, and then escorted him from the apartment so that the security check could be completed.

Proceeding to the next room, which was later determined to be Appellant's bedroom, the officers observed a bullet shell casing and blood on the carpet. After assuring themselves there were no additional victims or persons requiring medical attention, the officers vacated the residence. Outside the residence, the officers found a piece of plastic bumper along the curb and sidewalk directly beneath a damaged porch post, which later was determined the match the damage to the van.

10. Michael Miller, who lived in the apartment above Appellant, was charged in connection with the disposition of Kolesnik's body. Evidently, Appellant asked for Miller's assistance in moving a "heavy object" into the van. Suppression Court Opinion at 8. Miller helped Appellant slide the body into the van. *Id.*

Investigator Shearer prepared a search warrant, and a magisterial district judge issued the warrant authorizing a search of the premises. Pursuant to the search of the residence, the officers recovered from Appellant's bedroom a rifle shell casing, a shell casing on a dresser, a discharged bullet projectile, an impact indentation on the wall directly above the bullet, yellow electrical wire (which later was determined to have been the source of the wire wrapped around Kolesnik's body), yellow wire cutters (which later were determined to have cut the wire used to secure the tarp around the victim's body), a pool of blood at the foot of the bed, a pool of blood on the mattress, and a larger pool of blood on the underside of the mattress. Additionally, the search uncovered a Brinks lock box, which was located underneath the bed in Appellant's bedroom. Subsequently, a district judge issued a second search warrant authorizing the seizure of the contents of the lock box, which we discuss below.

Dr. Samuel Land, a certified forensic pathologist, performed an autopsy of Kolesnik's body. The autopsy revealed that Kolesnik's death was a result of a gunshot wound to the head.[11] The autopsy also disclosed that a boot lace was wrapped around Kolesnik's left arm in a fashion associated with intravenous drug use. Injection sites on Kolesnik's arms were observed and toxicology reports revealed the presence of morphine, codeine, and alcohol in Kolesnik's body.

Finally, additional evidence adduced at trial established that, on January 27, 2006, at an A–Plus minimarket on Perkiomen Avenue in Reading, Appellant and Kolesnik engaged in a heated argument regarding $20.00 and a cellular telephone. Three days later, on January 30, 2006, Wendy Hess, the victim's girlfriend with whom he lived, picked up Kolesnik after he finished his shift with the Reading Metro Taxi Company. The two returned to their home in Reading. After eating a meal, Hess and Kolesnik went to bed. When Hess awoke at 1:45 p.m., Kolesnik was gone and had evidently taken Hess' maroon van with him. In the interim, at approximately 12:15 p.m., Kolesnik went to the A–Plus minimarket on Perki-

11. No gun was ever recovered related to Kolesnik's murder.

omen Avenue where he was confronted by Appellant regarding the return of a cellular telephone.

Appellant was tried before a jury, commencing August 6, 2007. The jury found Appellant guilty of the above-stated crimes, including first-degree murder. On August 13, 2007, the jury found the aggravating circumstance that Appellant had a significant history of felony convictions involving the use or threat of violence to the person. 42 Pa.C.S.A. § 9711(d)(9). The jury also found as a mitigating circumstance that Appellant committed three of his prior felonies when he was a juvenile. *See* 42 Pa.C.S.A. § 9711(e)(8). The jury concluded that the aggravating circumstance outweighed the mitigating circumstance and rendered a verdict of death. On September 6, 2007, the trial court formally sentenced Appellant to death and a consecutive, aggregate sentence of no less than 5 nor more than 11 years' imprisonment for the convictions for abuse of a corpse, tampering with evidence, and theft by unlawful taking. The trial court imposed no further sentence on the remaining crimes. On September 27, 2007, Appellant filed a notice of appeal, and, on March 13, 2008, the trial court rendered its 1925(a) opinion, denying Appellant relief. This appeal followed.[12]

## I. Sufficiency of the Evidence[13]

It is our Court's practice to review the sufficiency of the evidence for first-degree murder in all direct appeals from the imposition of capital punishment irrespective of whether the appellant mounts a sufficiency challenge. *Commonwealth v. Champney*, 574 Pa. 435, 442, 832 A.2d 403, 407 (2003); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982). In the appeal *sub judice*, Appellant claims that his conviction for first-degree murder, as well as his convictions for theft by unlawful taking, and receiving stolen property, was not supported by sufficient evidence. In reviewing a claim regarding the sufficiency of the evidence, an

12. We have jurisdiction over the direct appeal from a judgment of a sentence of death pursuant to 42 Pa.C.S.A. § 722(4) and § 9711(h)(1).

13. For clarity, we have reordered the issues Appellant raises on appeal.

appellate court must determine whether the evidence was sufficient to allow the fact finder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. LaCava*, 542 Pa. 160, 171, 666 A.2d 221, 226 (1995). In doing so, a reviewing court views all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth. *Id.* Furthermore, in applying this standard, the Commonwealth may sustain its burden of proof by means of wholly circumstantial evidence. *Commonwealth v. Cousar*, 593 Pa. 204, 217, 928 A.2d 1025, 1032 (2007). When performing its review, an appellate court should evaluate the entire record and all evidence received is to be considered, whether or not the trial court's rulings thereon were correct. Additionally, we note that the trier of fact, while passing on the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence. *Id.* at 217, 928 A.2d at 1032–33. With these tenets in mind, we turn to Appellant's arguments concerning the sufficiency of the evidence.

## A. First–Degree Murder

■ First, Appellant claims that the evidence was insufficient to support his conviction for murder in the first degree. Specifically, Appellant offers that there is no evidence to establish either that he killed Kolesnik or that he had the specific intent to kill. No testimony placed him at his residence when Kolesnik was shot, and similarly, no evidence established that Appellant owned a gun or fired a gun as there was no residue found on his clothing or person. Moreover, evidence suggested that Kolesnik had a long history of heroin addiction and that he was despondent over his inability to be free from this addiction. Appellant avers that Dr. Land, who testified on behalf of the Commonwealth, could not tell from the observation of Kolesnik's body whether or not the gunshot wound was self-inflicted. According to Appellant, while Kolesnik's DNA was found on Appellant's watch, this was consistent with Appellant moving the body, but not that he was present when Kolesnik died. Thus, Appellant complains that the

evidence was insufficient to uphold the conviction for first-degree murder.

The Commonwealth responds that its theory of the murder was that Appellant, upset over circumstances surrounding his brother's incarceration,[14] shot Kolesnik in the head while Kolesnik was in the process of injecting heroin in Appellant's bedroom. Appellant then loaded Kolesnik's body into the van, intending to destroy both the body and the vehicle. Conversely, Appellant's theory was that Kolesnik shot himself in the head after attempting to commit suicide by overdosing. When viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, the Commonwealth maintains that there was sufficient evidence for the jury to conclude that Appellant killed Kolesnik and that Appellant did so with specific intent.

■ To prove murder of the first-degree, the Commonwealth must establish that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and a specific intent to kill. 18 Pa.C.S.A. §§ 2501, 2502(d); *Commonwealth v. Kennedy*, 598 Pa. 621, 629, 959 A.2d 916, 921 (2008). "Intentional killing" is defined as including killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing. 18 Pa.C.S.A. § 2502(d). The specific intent essential to support a first-degree murder conviction may be shown by use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Rivera*, 565 Pa. 289, 295, 773 A.2d 131, 135 (2001).

Upon review, we believe that the evidence adduced at trial, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to sustain the jury's verdict of first-degree murder. The evidence supports a finding that a human being was unlawfully killed, as the victim, Kolesnik, died from a gunshot wound to the head. Evidence further supports a finding that the person accused, Appellant, was

14. Appellant's dismay over his brother's incarceration was part of the Commonwealth's theory advanced at trial, but is not developed further for purposes of this appeal.

responsible for the death of the victim and that Appellant acted with malice and specific intent to kill.

Specifically, the evidence established that 15 hours before Kolesnik's body was found in the back of Hess' van, Appellant and Kolesnik were together at an A–Plus minimarket. Kolesnik was to go to Appellant's house later that day to return a cellular telephone, a source of controversy between the men, and which sparked an argument' between Kolesnik and Appellant a few days earlier at the same store. The evidence places Kolesnik at Appellant's residence where DNA analysis matches Kolesnik's DNA with that of blood on Appellant's mattress and a bullet. A trail of blood led from Appellant's residence to the curb. Appellant was stopped while driving a van, operating without the use of headlights, and while heading towards Nolde Forest, a secluded wooded park. When asked by police if anyone else was in the vehicle, Appellant responded, "just a dead guy" or "only the dead guy." In the cargo area of the van was Kolesnik's body and on the front passenger seat was a container full of gasoline. Kolesnik's body was wrapped in a blood-soaked covering, bound with electrical wire, which matched wire recovered from Appellant's room. Also, located in the vehicle was a cellular telephone belonging to Appellant's brother. Appellant was observed with blood on his pants, watch, and glasses. The blood on Appellant's watch matched Kolesnik's DNA. After being arrested, Appellant was instructed not to wash his hands, yet, Appellant attempted to wash his hands in a toilet bowl in his holding cell. Finally, Commonwealth witness, Dr. Land, an expert in forensic pathology, believed that the circumstances surrounding Kolesnik's death, combined with the crime scene evidence, strongly suggested a homicide. Dr. Land pointed to the fact that Kolesnik had a ligature still tied around his left arm, consistent with present drug use. As Dr. Land opined, because Kolesnik was right-handed, he would have had to have been shooting drugs into his left arm, yet, the entrance wound was in the left side of Kolesnik's head. This evidence, coupled with an attempt to hide the murder and the lack of notice to the police of a suicide, all pointed away from suicide and

toward a finding of a homicide. Based upon this evidence, we hold that the evidence supports the jury's conviction of first-degree murder.

## B. Theft By Unlawful Taking

Additionally, Appellant contends that the evidence was insufficient to establish theft by unlawful taking. While Appellant acknowledges that he was stopped operating Hess' van and was operating the van with a key attached to Hess' Jello key fob, according to Appellant, it could be inferred that Kolesnik had permission to use Hess' van, because Kolesnik and Hess lived together and were boyfriend and girlfriend. Moreover, evidence existed that Kolesnik and Appellant were friends. Appellant maintains that the Commonwealth did not present evidence that he did not have permission from Kolesnik to use the van or that he intended to deprive Hess of the van. Thus, as the evidence fails to establish that he intended to deprive Hess of her van, Appellant claims that the evidence does not support a conviction of theft by unlawful taking.

The Commonwealth points to Hess' testimony that the van belonged to her, that there was only one key to the van, and that the van key was on her Jello key chain. Moreover, Hess testified that she did not give her key ring to Appellant or give him permission to operate the vehicle. Furthermore, the Commonwealth submits that circumstantial evidence supported the Commonwealth's theory, accepted by the jury it contends, that Appellant killed Kolesnik and placed his body into the van with the intent to dispose of both the body and the van. Supporting this view, the Commonwealth notes that a full gasoline container was found on the front passenger seat of the van, and Hess testified that the gasoline container was previously empty in the cargo area of the van and was filled only if the van ran out of gas.

The trial court found the evidence sufficient to establish Appellant's conviction for theft by unlawful taking. Citing to the evidence offered by the Commonwealth above, the trial court concluded that there was sufficient evidence from which

the jury could have concluded that Appellant possessed the requisite intent to deprive Hess of her van.

To uphold a conviction for theft by unlawful taking, the Commonwealth must establish the accused "unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S.A. § 3921(a). We find that the evidence was sufficient to establish a theft by unlawful taking. Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, with all reasonable inferences drawn there from, and as set forth by the Commonwealth and the trial court, Appellant was found operating Hess' van, using the only keys to the vehicle, without Hess' permission. Appellant was driving the van towards a secluded wooded area, Nolde Forest, in the early morning hours without its headlights illuminated. In the cargo area of the van was the body of Hess' live-in boyfriend, and in the front passenger seat of the van was a container filled with gasoline. Based upon the evidence of record, as properly considered, we conclude that there was sufficient evidence to establish that Appellant exercised unlawful control over Hess' van with the intent to deprive her thereof. Thus, Appellant's claim fails.

## C. Receiving Stolen Property

■ Finally, Appellant complains that the evidence was insufficient to establish his conviction for receiving stolen property. Appellant points to the short time period from when the van was last seen by Hess and when the police stopped him while operating the van. He also highlights evidence that Appellant and Kolesnik were friends and contends that there is no evidence whether Kolesnik gave him permission to use Hess' van. Furthermore, Appellant develops that he voluntarily stopped the van after being ordered to by police, that he was cooperative with police, and that the van was not taken far from the residence of the owner. According to Appellant, all of these factors suggest the evidence is insufficient to establish that Appellant did not intend to re-

store the van to its owner, a necessary requirement to establish the crime of receiving stolen property.

The Commonwealth provides, in sum, that the same facts sufficient to establish the elements of theft by unlawful taking also support the conviction for receiving stolen property. The trial court agreed.

Receiving stolen property is established by proving that the accused "intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed of with intent to restore it to the owner." 18 Pa.C.S.A. § 3925(a). We conclude the evidence of record established the elements of receiving stolen property. Again, Appellant was stopped by police while driving Hess' van, without her permission, using her keys. Appellant was driving the van, without headlights illuminated, in the direction of Nolde Forest, with Kolesnik's body, as well as a container filled with gasoline. While Appellant offers a different scenario to explain the course of events, when the evidence is viewed in the light most favorable to the Commonwealth, the evidence was sufficient to establish that Appellant retained Hess' van, knowing it was stolen, and that he did not intend to return the van to Hess. Thus, we reject Appellant's sufficiency claims.

## II. Weight of the Evidence

■ In a related claim, Appellant alleges that the verdict of murder in the first degree was against the weight of the evidence. Specifically, Appellant contends that the Commonwealth's expert, Dr. Land, an expert in forensic pathology, testified that the cause of death of Kolesnik was a gunshot wound to the head and that the manner of death was homicide. Yet, as Appellant asserts, Dr. Land could not determine, solely by examining the victim's body, if the manner of death was a suicide or a homicide. Appellant's expert, Dr. John Shane, an expert in both forensic pathology and toxicology, testified that the manner of death was a suicide, stating that the victim had an extremely high level of opiates in his system,

that this constituted a suicide attempt by injecting such a large quantity of opiates. He also offered that the victim was attempting suicide by two means—a gunshot wound to the head and overdosing on opiates. Appellant reasons that, based upon this conflicting testimony between the Commonwealth's expert and his expert, the weight of the evidence does not support a verdict of guilty for murder of the first degree.

Appellant also claims that his convictions of theft by unlawful taking and receiving stolen property are against the weight of the evidence. With respect to both challenges, and similar to his sufficiency-of-the-evidence challenges, Appellant offers that, as Kolesnik had permission to use the van, he in turn had the authority to give permission to others to use the van. Appellant points out that the Commonwealth failed to provide evidence that the victim did not allow Appellant to use the van, and, therefore, Appellant avers that there was no evidence presented that Appellant was not given permission to use the van by Kolesnik before his death. Furthermore, Appellant maintains he was found operating the van belonging to Hess less than one day after she had last seen the van and he was using the proper key for the vehicle. Thus, Appellant asserts that the weight of the evidence did not support a finding that he did not plan on restoring the van to Hess and that he intended to permanently deprive her of the van. Therefore, according to Appellant, the convictions for theft by unlawful taking and receiving stolen property were against the weight of the evidence.

An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Cousar*, 593 Pa. at 222, 928 A.2d at 1035–36. A new trial is awarded only when the verdict is so contrary to the evidence as to shock one's sense of justice. *Id.* at 222, 928 A.2d at 1036. Appellate review is limited to determining whether the trial court abused its discretion in ruling on the weight claim, and not the underlying question of whether the verdict is against the weight of the evidence. *Id.* Based upon the above, it is plain that a "trial court's denial of a motion for a new trial

based on a weight of the evidence claim is the least assailable of its rulings." *Id.* at 223, 928 A.2d at 1036.

Our review of the record reveals that the trial court did not abuse its discretion in dismissing Appellant's weight-of-the-evidence claims. First, the testimony established that Kolesnik died from a gunshot wound to the head. The jury concluded that Appellant was the perpetrator and that he possessed the requisite specific intent for first-degree murder. While Appellant's argument focuses on allegedly conflicting testimony by the Commonwealth's expert and his expert, he fails to acknowledge that the Commonwealth's expert strongly indicated Kolesnik's death was a homicide. Moreover, the jury was free to believe all, part, or none of the defense testimony. *Commonwealth v. Vandivner*, 599 Pa. 617, 631, 962 A.2d 1170, 1178 (2009). Evidently, the jury disbelieved Appellant's expert that Kolesnik shot himself in an attempted suicide. Thus, Appellant's weight-of-the-evidence challenge is without merit.

Similarly, Appellant's assertions that the verdicts for theft by unlawful taking and receiving stolen property were against the weight of the evidence fail. The Commonwealth offered direct and circumstantial evidence that Appellant did not have permission to use Hess' van, that Appellant had Hess' keys, and that Appellant killed Kolesnik, loaded the victim's body into the van, drove the body toward a secluded wooded park, and brought with him a container filled with gasoline, all with the intent to dispose of both the body and the van. The jury found the elements of theft by unlawful taking and receiving stolen property were satisfied. We simply cannot conclude that the jury's verdicts were so contrary to the evidence as to shock one's sense of justice. Thus, the trial court acted within its discretion in rejecting Appellant's motion for a new trial on the basis that the verdicts were against the weight of the evidence.

## III. Suppression

Appellant argues that the trial court erred when it denied his motion for suppression of the physical evidence seized

from his apartment where the initial warrantless entry was made without probable cause and where there were no exigent circumstances present to justify a warrantless search.[15] First, Appellant offers that the police had the victim's body for 5 hours prior to finding the alleged blood trail at 312 South 18th Street. Moreover, Appellant claims that his father did not see any blood when he was escorted by police from the apartment. Furthermore, the police had no way of connecting the blood outside of the apartment to the victim. Appellant asserts that the officers at the apartment had no reason to conclude that there were any victims inside of the apartment. According to Appellant, it was only after the police heard a faint voice from inside the apartment, after their second knock on the front door, that the police decided to conduct a security check. Appellant suggests that this series of events is even questionable, as his father was the only individual in the apartment and he was asleep. In sum, Appellant maintains that the police manufactured the exigency in order to avoid the warrant requirement. Additionally, Appellant contends that, rather than a security check, the police were engaging in a concentrated search, as, according to Appellant's father, the police were in the apartment for at least 10 minutes before escorting him outside. Moreover, Appellant's father testified that, upon his leaving the premises, he heard one of the police officers indicate that he had found something, which suggests a search rather than a security check.

Appellant also challenges the affidavit of probable cause as it failed to set forth a proper nexus between the death of the victim and the search of Appellant's apartment. The affidavit stated only that Appellant was operating a van which had a dead body in the back cargo area, and, according to Appellant, the only connection between Appellant and the apartment was it was on his driver's license when he was stopped by police.

---

**15.** While Appellant cites to both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution in support of his argument, he fails to offer any argument that the analysis of the issue is distinct under the Pennsylvania Constitution. Therefore, we consider his claim for relief only under our federal charter.

Related thereto, Appellant asserts that blood on the sidewalk failed to establish that a crime occurred inside the residence, and, thus, failed to set forth circumstances to support a finding of probable cause.

The Commonwealth retorts that the initial warrantless entry into Appellant's apartment was permitted under the exigent circumstances exception to the warrant requirement. Specifically, the Commonwealth offers that an exception exists where there is a danger to police or others. This includes situations in which it is believed that someone within a residence is in danger or in need of assistance. Additionally, the Commonwealth submits that the warrantless entry was a security check designed to ensure that there were no additional victims inside the residence. According to the Commonwealth, this was a protective sweep which has been sanctioned as constitutionally permissible.

The Commonwealth further offers that, here, the officers were investigating a grave offense where a dead body was observed in the vehicle driven by Appellant. The officers observed what appeared to be fresh damage to the vehicle, and officers were dispatched to the residence of the driver to investigate as to the damaged vehicle parts. The Commonwealth argues that, once at the scene, the officers had probable cause to suspect a crime was committed at the subject premises, due to the fact that a dead body was found in a van driven by Appellant, and a fresh trail of blood was located outside of his residence leading into the apartment. Furthermore, out of concern for additional victims within the residence in need of medical attention, based upon the trail of blood outside of the residence, as well as a muffled voice coming from inside the residence, the officers entered the residence. Finding no additional victims, the officers vacated the premises and awaited a warrant.

Additionally, the Commonwealth maintains that, to the extent Appellant claims that the search warrant pertaining to his residence was issued without probable cause, such claim is without merit. The Commonwealth submits that, as the police were lawfully in Appellant's residence under the exigent cir-

cumstances exception to the warrant requirement, they could have seized incriminating items in plain view. Nevertheless, the police vacated the premises, and awaited a warrant. Here the warrant issued was supported by the fact that Appellant was stopped while driving a van containing a dead body. Appellant was splattered with blood. At Appellant's residence, the officers observed a fresh trail of blood leading from the sidewalk to the front door, as well as a broom with blood on it. According to the Commonwealth, this alone would have provided sufficient probable cause for the issuance of a warrant for the residence. Moreover, once the officers were lawfully inside of the residence, they observed various items in plain view of an incriminating nature which were readily apparent. These items included the pool of blood near Appellant's bed and a bullet shell casing.

The suppression court determined that the initial entry into Appellant's home prior to securing a search warrant was permissible as a result of exigent circumstances. The court noted that Appellant was found driving another person's vehicle, he had blood on his pants, watch, and glasses. There was a corpse wrapped in a tarp in the back of the van. Outside Appellant's residence, the police observed a trail of blood leading to Appellant's home, and, after knocking on the front door, the police heard a muffled human voice coming from within the residence. Due to the reasonable concern that additional victims could be in the residence, the court concluded that the police were legally permitted to enter the residence to secure the location. The court also considered the sufficiency of the affidavits in support of the search warrant for Appellant's residence. Based upon the officers' observations during the lawful warrantless security check of Appellant's residence due to exigent circumstances, the suppression court found the affidavit established probable cause for the issuance of a warrant and the subsequent search and seizure.

In reviewing a suppression ruling, we are bound by the suppression court's factual findings, unless they are with-

out support in the record. *Commonwealth v. DeJesus,* 567 Pa. 415, 427–28, 787 A.2d 394, 401 (2001). We may reverse the legal conclusions reached by the suppression court, however, if they are in error. *Id.* Thus, our standard of review of the legal conclusions reached by the suppression court is de novo. Where, as here, the defendant is appealing the ruling of the suppression court, we consider only the evidence of the prosecution, and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the entire record. *Id.*

Generally, the police will be excused from compliance with the warrant and probable cause requirements of the Fourth Amendment to the United States Constitution in only limited circumstances. One of these circumstances is when the police reasonably believe that someone within a residence is in need of immediate aid. *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Commonwealth v. Miller,* 555 Pa. 354, 364, 724 A.2d 895, 900 (1999); *Commonwealth v. Silo,* 509 Pa. 406, 410, 502 A.2d 173, 175 (1985). The suppression court found that the police reasonably believed that additional victims could be inside Appellant's residence based upon, *inter alia,* their finding of a trail of fresh blood leading to Appellant's residence and the hearing of a faint voice coming from within the home. While the police in this matter were investigating a crime, the suppression court did not find, which the record provides no basis to question, that it is a case where the police created their own exigency and acted upon it. *See, e.g., Commonwealth v. Melendez,* 544 Pa. 323, 330, 676 A.2d 226, 229 (1996). Based upon these circumstances, we conclude that the suppression court's factual findings were supported by the record and its legal conclusions regarding the existence of exigent circumstances creating an exception to the warrant requirement was legally sound. Therefore, we hold that the initial entry into Appellant's residence prior to securing a search warrant was legally permissible due to exigent circumstances. Thus, we next assess whether the search warrant was supported by probable cause.

 In determining whether a search warrant is supported by probable cause, appellate review is confined to the four corners of the affidavit. *Commonwealth v. Coleman*, 574 Pa. 261, 271, 830 A.2d 554, 560 (2003). Probable cause, in turn, is a practical, non-technical concept which requires consideration of the totality of the circumstances. *Id.* The district judge that is requested to issue a warrant makes a practical, common-sense determination as to whether, given all of the facts and circumstances provided in the affidavit, including the veracity and basis of knowledge of the persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a certain locale. The duty of the reviewing court is to simply ensure that the district judge had a substantial basis for concluding that probable cause existed. *Id.* at 271–72, 830 A.2d at 560 (quoting *Commonwealth v. Gray*, 509 Pa. 476, 484, 503 A.2d 921, 925 (1985), in turn quoting *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

The warrant at issue in this appeal identified the items to be searched at the 312 South 18th Street residence as:

Blood, clothing, light colored electrical wire, bedding, tarps, DNA, hairs, fibers, firearms, amunition [sic], cleaning materials, brooms, mops, cutting instruments and tools, measurements, photographs, video tape, records of ownership and occupancy, and any other forensic evidence which may be related to this case.

Commonwealth Exhibit No. 41, N.T., 8/6/07, at 967.

Here, the affidavits of probable cause offered in support of the search warrant provided a description of the police observing Appellant driving the van at night without its headlights illuminated, the stopping of the van, the observation, in plain view, of Kolesnik's body, which was covered in a tarp which was wrapped with electrical wire, and on which there was blood. Additionally, the affidavits contained the officers' observations of blood on Appellant's leg, wrist watch, and glasses. The affidavits also contained the police officers' observations of fresh blood leading from the front door of Appellant's residence to the sidewalk, and a blood-covered broom on the

sidewalk. Moreover, the affidavits described the officers' approach to the door to determine if persons were in need of emergency treatment, the hearing of a faint voice, and the officers' entry into the residence. Finally, the affidavits described the officers' search for persons within the residence, and the observations of the officers once inside the residence. Specifically, the affidavits referenced the officers' observation of a fresh pool of blood on the carpet next to the bed and an expended bullet shell casing on the floor next to the bed.

Based upon our review of the facts and circumstances set forth in the affidavits of probable cause in support of the search warrant, we believe that the district judge properly concluded that there was a fair probability that evidence of the crime would be found at Appellant's residence, and the district judge had a substantial basis for concluding that probable cause existed. In response to Appellant's argument that the observations of the officers while in his apartment should not have been part of the affidavit, we note that the officers were legally within Appellant's residence. Police officers are not required to close their eyes to matters in plain view while they are at a legal vantage point. Thus, their observations while in Appellant's residence were properly considered as part of the affidavits. Furthermore, the information contained in the affidavits in support of the search warrant, even excluding the observations of the police officers while inside Appellant's residence, was probative—establishing a nexus between Appellant, who was stopped with Kolesnik's corpse, the fresh blood observed outside of Appellant's residence leading to the front door of the apartment, and Appellant's residence. Therefore, based upon the information contained in the affidavits in support of the search warrant, we concluded that the, suppression court properly rejected Appellant's motion to suppress.

## IV. Suppression of Lock Box

Appellant also contends, in a cursory argument, that the only reason a lock box was discovered was due to the initial warrantless entry which resulted in the initial search warrant

by police. Once the observations made by police are removed from the affidavit, Appellant maintains that there is not probable cause to search the residence. Furthermore, Appellant asserts that the only reference to the lock box was that it was located in Appellant's bedroom, under the bed where the police observed a pool of blood. Appellant submits that the affidavit of probable cause is devoid of explanation regarding how the items in the lock box are connected to criminal activity or what might be found inside the lock box. Thus, according to Appellant, the items taken from the lock box should be suppressed.

The Commonwealth asserts that the officers at Appellant's apartment vacated the premises after determining that there were no additional victims at the scene, and awaited the issuance of a warrant. The warrant provided for seizure of, *inter alia*, ammunition, photographs, records of ownership and occupancy, and any other forensic evidence which may be related to the case. It was reasonable, according to the Commonwealth, that the lock box located under Appellant's bed, near a fresh pool of blood, would contain any or all of the items listed above. Furthermore, the Commonwealth obtained a second search warrant for the contents of the lock box, which contained prescription bottles, a spoon with residue, a syringe, miscellaneous documents and IDs, a letter from Appellant's brother, Cory, and assorted coins. As noted above, the suppression court determined that, based upon the circumstances, a lawful security check was fully justified, permitting the officers to legally be in the residence without a search warrant. Thereafter, the police followed the proper procedures in obtaining a valid search warrant to seize, open, and search the lock box.

We find that Appellant has failed to establish that the search warrant obtained for the lock box was not supported by probable cause. As referenced above, the initial warrantless search was justified by the exigent circumstances exception to the warrant requirement. Thereafter, the officers vacated the premises without seizing any items and waited for the issuance of a warrant. The warrant was properly issued. The

lock box, lying near the pool of blood in Appellant's room and a bullet casing, was seized during the search of the residence pursuant to the warrant which permitted seizure of ammunition, photographs, records of ownership and occupancy, and other forensic evidence related to the case. Thus, we agree with the trial court and the Commonwealth that it was probable that evidence of the crime would be contained in the lock box located under Appellant's bed, near a fresh pool of blood and a bullet casing, and that it could contain certain of the items listed in the search warrant. Furthermore, as noted above, a second warrant was issued for the contents of the lock box. Thus, we believe that Appellant has failed to establish that the seizure of the lock box and its contents was improper.[16]

### V. Jury Instruction on Voluntary Intoxication

█ Appellant claims that the trial court improperly denied his requested jury instruction for voluntary intoxication. Appellant highlights Sergeant Griffith's testimony that Appellant appeared to be under the influence of drugs or alcohol at the time of his arrest. Furthermore, Sergeant Griffith testified that Appellant was not moving when he was placed into Officer Hine's patrol car and that Appellant appeared to be asleep and had his eyes closed. In further support of his argument that he was intoxicated, Appellant emphasizes that he was driving a van that he did not own, without headlights, carrying a corpse, and that once he was in his holding cell, he dunked his hands in toilet water and washed them, even though a sink was available.

The Commonwealth responds that the trial court properly denied a jury instruction based upon voluntary intoxication. Specifically, the Commonwealth explains that the trial court

16. Appellant also suggests that the police violated the "knock and announce" rule. *Commonwealth v. Chambers*, 528 Pa. 403, 598 A.2d 539 (1991). The trial court found this issue to be waived as Appellant failed to properly raise the issue in his Omnibus Pretrial Motion and did not take testimony on this issue at either of two suppression hearings. As Appellant does not address the trial court's finding of waiver, and fails to develop this argument in any meaningful fashion in his brief before us, we find that he has waived this issue for purposes of appellate review. Pa.R.A.P. 302.

properly found that there was no evidence that Appellant had actually consumed drugs or alcohol prior to the killing, or that he was overpowered or overwhelmed to such a degree that he was incapable of forming the intent to kill. In fact, Appellant's attempt to conceal the murder and dispose of Kolesnik's body suggested that he understood the nature, gravity, and consequences of his actions.

In order to be entitled to a voluntary intoxication instruction, there must be some evidence that the defendant is overwhelmed or overpowered by alcohol or drugs to the point of losing his faculties or sensibilities. *Commonwealth v. Tilley*, 528 Pa. 125, 136, 595 A.2d 575, 580 (1991). Mere evidence of the consumption of alcohol or drugs and appearing intoxicated is not sufficient to support a conclusion that a defendant is overwhelmed or overpowered to be incapable of forming the requisite specific intent to kill. *Id.* Moreover, our standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law. *Commonwealth v. DeMarco*, 570 Pa. 263, 271, 809 A.2d 256, 260–61 (2002).

The only evidence supporting Appellant's intoxication claim was the testimony of Sergeant Griffith, who stated that he believed Appellant was under the influence of drugs or alcohol. This was based upon Appellant's slow response to questioning. As noted by the trial court, none of the other officers who interacted with Appellant the night he was arrested believed that he was under the influence of drugs or alcohol. Furthermore, Appellant had the presence of mind to remove Kolesnik's body from his residence, wrap and bind the victim's body, and drive the body toward a secluded wooded area, during which he attempted to elude capture. Rather than being overwhelmed, these actions strongly demonstrate an individual acting coherently and methodically. *See Commonwealth v. Cuevas*, 574 Pa. 409, 419–20, 832 A.2d 388, 394 (2003) (upholding denial of involuntary intoxication instruction, finding intoxication did not deprive defendant of understanding the importance of hiding his crime and himself). Additionally,

while Appellant points to his dunking of his hands in a toilet to support his claim, this meager act is simply insufficient to show that Appellant was overwhelmed or overpowered by drugs or alcohol to the point of losing his faculties so as to require a charge of voluntary intoxication. Thus, we hold that the trial court did not abuse its discretion or commit legal error in refusing to charge the jury regarding voluntary intoxication.

## VI. Verdict Slip

Appellant alleges that the trial court erred in accepting a verdict of death even though the verdict slip did not indicate the finding of any aggravating circumstances. Specifically, Appellant contends that the jury returned with a verdict of death after its deliberation, finding as an aggravating circumstance a "history of progressively more violent felonies." N.T., 8/13/07, at 77. After review of the verdict slip, the trial court instructed the jury that the circumstance they found was not a specific statutory factor under 42 Pa.C.S.A. § 9711 and the jury was instructed to continue deliberations. The court pointed out the aggravating circumstance sought by the Commonwealth. The jury then returned a verdict of death citing Section 9711(d)(9).[17] According to Appellant, the trial court prejudiced him when it "in essence, forced the jury to find an aggravating factor that they had not initially found." Appellant's Brief at 50.

The Commonwealth retorts that the trial court properly instructed the jury on the aggravating circumstance sought by the Commonwealth, i.e., whether Appellant "has a significant history of felony convictions involving the use or threat of violence to the person." N.T., 8/13/07, at 68. According to the Commonwealth, once the jury came back with a finding of the aggravating circumstance regarding a history of progressively more violent felonies, the trial court called a sidebar at which the trial court expressed its belief that the appropriate way to resolve the problem was to "point this out to the jurors

17. "The defendant has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S.A. § 9711(d)(9).

and send them back upstairs." N.T., 8/13/07, at 79. Defense counsel responded, "I would agree, Your Honor." *Id.* Thereafter, the trial court reinstructed the jurors that the aggravating factor listed on the verdict slip was not an aggravating factor under the law. The trial court went on to explain to the jury that they were excused for further deliberations as to whether or not they found a statutory aggravating circumstance:

Now, I don't know and will not speculate as to what was meant by the aggravating circumstance that you have listed here. I can only tell you that, as stated, it is not an aggravating circumstance under Pennsylvania law. Therefore, I am not going to record this verdict as stated. What I'm going to do instead is I'm going to excuse you to return to the jury deliberations room and determine through further deliberations—you should determine through further deliberations whether or not you have found a statutory aggravating circumstance. And the instructions that I gave you previously about what you should do if you find one apply. And what you should do if you do not find one apply as well as the instructions on the verdict slip itself.

N.T., 8/13/07, at 81. Thus, the Commonwealth argues that, as defense counsel never objected to the trial court's decision to reinstruct the jury on the proper aggravating circumstance and to return them to deliberate, but concurred with this approach, counsel cannot now claim trial error.

Based upon the above, we find that, by failing to object to the trial court's decision to reinstruct the jury or to the jury instruction, the issue as couched has been waived. Pa.R.A.P. 302. Moreover, even a cursory review of the record reveals that the trial court did not order the jury to find a statutory aggravator, but, rather, invited the jury to deliberate further and determine whether or not they found a permissible statutory aggravator. Thus, Appellant is not entitled to relief.

### VII. Examination of Expert Through Use of Hypothetical Questions

██ Next, Appellant challenges the trial court's refusal to permit trial counsel to ask hypothetical questions of its expert

witness, because the court concluded the record did not support such questions. Appellant contends that, because there was record support for such questions, the trial court's denial of these questions was improper. The exchange at trial reveals that Appellant's counsel attempted to ask Dr. Shane hypothetical questions regarding Kolesnik's alleged overdose from heroin and his time spent in rehabilitation.

BY MR. WELSH [Appellant's counsel]

Q: Doctor, I'll give you some hypotheticals, if I may.

Doctor, assume that the deceased, Kristofer Kolesnik, had a long history of heroin addiction, would that be significant in helping you formulate an opinion as to manner of death?

A [Dr. Shane]: The answer is yes or no. And he would certainly require higher dosages for a high, but certainly, his central nervous system and respiratory centers would be in stress and depressed. And failed opiates would not be— in terms of high levels of respiratory tolerances that we see in other drugs—

Q: Let me ask you this, assume that Kristofer Kolesnik overdosed from heroin, but survived, would that be significant in helping you in forming an opinion as to the manner of death—

MR. BALDWIN [District Attorney]: Objection, Your Honor

THE COURT: Objection sustained

BY MR. WELSH: Q Doctor, assume that Kristofer Kolesnik received treatment in five (5) rehabs and then after the last rehab, which would have been in November—actually December—November of 2005, would that be significant— and thereafter got back on heroin—

\* \* \*

MR. WELSH: —would that be significant in helping you form an opinion as to the manner of death?

MR. BALDWIN: Again, same objection, Your Honor.

THE COURT: The objection is sustained.

N.T., 8/9/07, at 688–89.

Appellant maintains Hess testified that Kolesnik overdosed on heroin sometime in early 2006 at the A–Plus minimarket located on Perkiomen Avenue. Appellant avers that, because Hess' testimony establishes that the victim overdosed in 2006, the court erred in denying Dr. Shane the ability to answer that question. Hess also offered that the victim had a lengthy history of heroin addictions and had spent time on five different occasions at rehabilitation facilities. Again, Appellant submits that the facts underlying this question are in the record as Hess testified that the victim had been in five rehabilitation facilities and that he overdosed on heroin in 2006. In further support of his argument, Appellant points to Dr. Shane's testimony that the amount of opiates in the victim's system were so elevated that they constituted a suicide attempt by overdosing on opiates. Dr. Shane also opined that the victim was attempting suicide by either overdose of heroin or a gunshot wound to the head.

The Commonwealth disputes the basis for Appellant's argument by responding that there was not competent evidence in the record establishing that Kolesnik had overdosed. While Hess was questioned whether Kolesnik had overdosed previously, she testified only: "He told me that happened. I wasn't there." N.T., 8/8/07, at 513. There was no other testimony introduced at trial establishing that an overdose had, in fact, occurred. Thus, according to the Commonwealth, the trial court acted within its discretion in precluding the hypothetical question. Similarly, the Commonwealth acknowledges that, with respect to the hypothetical regarding Kolesnik's rehabilitation efforts, Hess testified that Kolesnik had been in 5 rehabilitation facilities, but always relapsed. Furthermore, Appellant's brother, Cory Galvin, explained that Kolesnik had expressed desperation over being thrown out of rehabilitation and was unable to kick his heroin addiction. Yet, according to the Commonwealth, the trial court acted within its discretion when it concluded there was insufficient evidence to support any assumptions regarding the time the victim spent in reha-

bilitation. As the trial court explained, "such details like the length of Kolesnick's [sic] time in treatment, the nature of his treatment, and the reasons for being kicked out of rehab would be relevant and likely necessary for Dr. Shane to offer a competent, permissible opinion about the effect, if any, of Kolesnick's [sic] time in rehab." Trial Court Opinion, 3/13/08, at 27. Thus, the Commonwealth submits that Appellant is not entitled to relief.

■ The use of hypothetical questions is proper when there is evidence of record supporting the hypothetical. *Commonwealth v. Petrovich*, 538 Pa. 369, 372, 648 A.2d 771, 772 (1994) (expert may give his opinion in response to a hypothetical if the set of facts assumed in the hypothetical is supported by competent evidence). An expert, however, may not base an opinion on conjecture or guesswork. *Id.* Moreover, the admissibility of expert testimony is vested within the sound discretion of the trial court and will not be overturned unless the trial court commits an abuse of that discretion. *Id.*

We believe the trial court properly resolved this issue. Without a sufficient basis in the record, a hypothetical question based upon incompetent testimony is improper. Here, the trial court noted that Appellant failed to offer competent evidence to establish that the victim overdosed. Furthermore, there was a dearth of specific information regarding the alleged overdose, such as when the overdose occurred, what caused the overdose, or any of the ramifications of the overdose. Thus, Appellant failed to make a preliminary showing sufficient to permit the hypothetical question regarding Kolesnik's alleged overdose. As there was insufficient evidence in the record concerning the victim's overdosing, hypothetical questions based upon such an assertion were properly denied.

Furthermore, we conclude that the trial court properly denied the hypothetical questions based upon Kolesnik's time at a rehabilitation facility. The trial court properly opined that, while there was some evidence that the victim spent time in a rehabilitation facility, there was insufficient testimony regarding the circumstances of the victim's treatment in reha-

bilitation to permit Dr. Shane to offer a competent permissible opinion about the effect, if any, of Kolesnik's time in rehabilitation. Thus, we find that the trial court did not abuse its discretion in denying the hypothetical questions based upon such treatment.

## VIII. Use of Common Practice Questions

Finally, Appellant complains that the trial court improperly denied his brother, Cory Galvin, the opportunity to testify at trial regarding the common practice of Appellant and others while in Appellant's apartment regarding heroin use. Specifically, Galvin would have testified that he had known Kolesnik for over 10 years; that he, the victim, and Appellant were friends; and that they had used heroin with each other on some occasions. According to Appellant, the testimony of his brother established a pattern or habit of individuals using heroin in Appellant's apartment, which would have supported his theory that Kolesnik died alone in Appellant's apartment as a result of suicide.

The Commonwealth responds that, at the time such testimony was elicited, the Commonwealth objected, and defense counsel specifically acknowledged that the testimony was not being introduced to establish a common practice or habit:

THE COURT: I have another question. Where is this going? The decedent's drug use has been well established, as has the defendant's drug use and this witness's drug use, what is the import of this testimony.

\* \* \*

MR. WELSH: The question is that this was a drug house where [Appellant] would go get drugs and the others would stay alone in the room while he obtained the drugs—

MR. BALDWIN: I object to that because the question is what happened on January 31st—January 30th and 31st. This witness was locked up, he doesn't know.

MR. WELSH: It wasn't any different in November or October when he wasn't locked up than when he was locked up.

THE COURT: Is it your contention that there was a practice that may have existed prior to this guy's incarceration that you can establish what happened in January through the use of that?

MR WELSH: No, we have other witnesses for January.

N.T., 8/9/07, at 698–699. Therefore, the Commonwealth emphasizes that trial counsel specifically denied that the purpose of the testimony was to establish a continuing course of behavior that would establish a common practice. Thus, the Commonwealth stresses that Appellant cannot now claim trial court error when trial counsel failed to seek admission of the testimony on the basis now asserted.

Based upon the above testimony, the trial court determined, *inter alia*, that Appellant was not attempting to establish a routine practice through the testimony of his brother. Appellant stated that other witnesses would establish that routine during the relevant time. Furthermore the court concluded that, even if Appellant had tried to establish a habit through his brother, drug use in a person's house is not the type of habit or routine that would be admissible under the rules of evidence. Thus, the court rejected this claim.

Pennsylvania Rule of Evidence 406 establishes that evidence of the habit of a person or a routine practice is relevant to establish that the conduct of a person on a particular occasion was consistent with such habit.

> Evidence of the habit of a person or of routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Pa.R.E. 406.

■ Admission of evidence is within the discretion of the trial court and will not be overturned unless the trial court commits an abuse of that discretion. *Commonwealth v. Minerd*, 562 Pa. 46, 54, 753 A.2d 225, 229 (2000). One must object, however, to the particular basis on which to admit or deny such evidence. *Commonwealth v. Scarborough*, 491 Pa. 300,

319, 421 A.2d 147, 156 (1980); Pa.R.A.P. 302. We agree with the Commonwealth that the basis on which Appellant challenges the trial court's refusal to admit the evidence of a purported habit or routine practice was not offered as a basis for the admission of the evidence by trial counsel during the hearing. Thus, the trial court properly rejected Appellant's argument.

## IX. Statutory Review of Death Penalty Verdict

Having reviewed all of Appellant's claims, we conclude that relief is not warranted. Accordingly, this Court must affirm the sentence of death unless we determine that it was a product of passion, prejudice, or any other arbitrary factor. 42 Pa.C.S.A. § 9711(h)(3)(i). After careful review of the record, we find that the sentence of death was not a product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence admitted at trial. Further, pursuant to 42 Pa.C.S.A. § 9711(h)(3)(ii), we determine that the evidence was sufficient to support the aggravating circumstance the jury found in imposing a sentence of death. Lastly, this sentence complies with 42 Pa.C.S.A. § 9711(c)(1)(iv), which mandates a sentence of death when the factfinder finds one or more aggravating circumstances that outweigh any mitigating circumstances.

Accordingly, we affirm the verdict and sentence of death imposed upon Appellant by the Court of Common Pleas of Berks County.[18]

Chief Justice CASTILLE and Justices SAYLOR, EAKIN, BAER, McCAFFERY and GREENSPAN join the opinion.

---

18. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S.A. § 9711(i).