J-S44021-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MERLE ALAN PAGE, JR. | : | |
| | : | |
| Appellant | : | No. 46 WDA 2019 |

Appeal from the Judgment of Sentence Entered February 21, 2018
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0001439-2017

BEFORE: SHOGAN, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED FEBRUARY 3, 2020**

Merle Alan Page, Jr. appeals from the judgment of sentence entered following his jury-trial conviction for third-degree murder, recklessly endangering another person ("REAP"), possessing instruments of crime ("PIC"), and firearms not to be carried without license.[1] He maintains the trial court should have given a voluntary manslaughter jury instruction and that the court failed to award him credit for time served. We conclude the trial court did not err in denying his request for a voluntary manslaughter instruction. However, we vacate the sentencing order and remand for the trial court to determine whether Page is entitled to credit for time served.

---

[1] 18 Pa.C.S.A. §§ 2502(c), 2705, 907, and 6106(a)(1), respectively.

The facts and procedural history of this case are as follows. Following a shooting at a Shell gas station, police arrested and charged Page, and he proceeded to a jury trial.

At trial, Page's cousin, Shawnquel Pennamon, testified that he was with Page on the night of the shooting. According to Pennamon's testimony, after attending a party for their grandmother, he, Page, and Deonte Duck went to the Off-the-Wall Bar. Pennamon said he and Page were drinking, and they "pop[ped] a Molly," which was a party drug that gave an energy boost. N.T., 1/8/18, at 100-01. They then travelled to a bar named Marty's, but were unable to enter because a fight had occurred inside the bar. *Id.* at 103-04. The trio stopped at the Shell station and bought cigars. After they left, they realized that they forgot to purchase gas, so they returned to the Shell station. *Id.* at 110.

Pennamon testified that when they returned, the victim, Marcell Flemings, was in a car at the gas station. The victim had been sprayed with mace during the fight at Marty's. Pennamon stated that at first Page and Duck were attempting to assist the victim. *Id.* at 111-12. An argument then broke out. He testified that he could not hear much of the argument, but believed he heard the victim say something about someone's brother. *Id.* at 112. He further stated the fight was about "[a] baby mom or something." *Id.* at 112-13. Pennamon testified that the video showed the victim taking off his coat and walking toward Page. *Id.* at 141. Pennamon said Page took a swing at the victim, and people tried to break up the fight. *Id.* at 113. Pennamon saw

Page headed back to the car, and the victim started walking to the same vehicle. *Id.* at 143. As Pennamon was headed back to the driver seat, he heard a gun shot. *Id.* at 115. Pennamon, Page, and Duck drove away, and then abandoned the vehicle and fled on foot. *Id.* at 120.

A store clerk from the Shell gas station, Sean Price, testified that he saw the argument and that the only statement he heard was the victim's last words, which were, "[W]hat are you going to do, shoot me?" *Id.* at 162-63.

Police officers who investigated the shooting also testified, and the prosecution put into evidence a copy of surveillance video from the Shell station, depicting the events. In defense, Page presented the testimony of his girlfriend, Adejah Pacley, who was not at the Shell station at the time of the shooting.

Page asked the court t instruct the jury on voluntary manslaughter, arguing that Page shot the victim in the heat of passion and did not have an opportunity to cool down. *Id.* at 217. The trial court denied the request, finding the evidence did not warrant the instruction:

> I think it would make a mockery of the crime of voluntary manslaughter, because the video clearly shows [the victim is] disabled when he's first there, he can't even see. He's walking around, some people are guiding him. Your client is well aware of that. Your client is standing there watching him put milk on his face and knows that[] he's not a harm, you know, he's not armed. Doesn't – put it this way, there's no arms there at all. There's nothing going on at that point and he was in no condition to present a threat to anybody at that point.
>
> Now, when he comes out of . . . the convenience store, obviously his eyesight is better and the video speaks for

itself that they get into a verbal argument. But a verbal argument in and of itself is not a basis for heat of passion. And in fact, in all of this – and you're correct . . . in your analysis – all this is undisputed.

Then your client basically rushes the guy. I mean it's clear that he's the one who rushes the guy and that's when they have the physical altercation. So he's not afraid of him at that point. Rushes him, it looks like he's getting the better of him basically, does some back pedaling and then they go out of the picture.

So then they come back into the picture. Your client is over by his car, has the opportunity to leave in the car. Granted, and I know you're going to make this argument, but he starts to come forward, [the victim]; but there's also people trying to intervene and there's no reason under those circumstances for your client to go get the gun and come out and shoot. Especially – let's just say hypothetically there was heat of passion for him to go get a gun, but you get a gun and here's a guy standing in front of you and in a well lit area with his arms out and has no weapons and you're shooting the unarmed man at close range with other people around and you shoot multiple times. I don't see that as heat of passion.

N.T., 1/9/18, at 4-6.

The jury found Page guilty of third-degree murder, REAP, PIC, and firearms not to be carried without a license. The trial court sentenced Page to 240 to 480 months' incarceration for third-degree murder, 12 to 24 months' incarceration for REAP, 14 to 28 months' incarceration for PIC, and 42 to 84 months' incarceration for firearms not to be carried without a license. The sentences were imposed consecutive to each other. The court did not give Page credit against the sentence for time served in jail pending trial. Rather, it stated on the record that it would give the credit against sentences it was

imposing in two separate cases[2] in which it was revoking parole. N.T., 2/21/18, at 42.

Page filed a motion to reconsider/modify sentence, which the trial court denied. Page did not file a notice of appeal, but did file a timely petition pursuant to the Post Conviction Relief Act seeking reinstatement of his direct appeal rights *nunc pro tunc*. The trial court re-instated his direct appeal rights, and Page filed this appeal.

Page raises the following issues:

> 1. Did the trial court commit an abuse of discretion and/or error of law when it denied the defense's request for an instruction on voluntary manslaughter (heat of passion)?

> 2. Did the trial court err when it failed to award all of the credit for the time [Page] served after his arrest on this docket until his sentencing (i.e. January 27, 2017 to February 21, 2018)?

Page's Br. at 7 (suggested answers omitted).

Page first argues that the evidence admitted at trial supported a heat of passion jury instruction. He argues that the victim started the argument, made reference to his brother and/or a "baby mama," took off his coat as if to fight, and followed Page.

The trial court did not err in finding the instruction not warranted. A trial court should instruct as to "heat of passion" voluntary manslaughter "only where the offense is at issue and the evidence would support such a verdict." ***Commonwealth v. Sanchez***, 82 A.3d 943, 979 (Pa. 2013) (quoting

---

[2] Docket numbers CP-25-CR-0002700-2017 and CP-25-CP-0002515-2016.

*Commonwealth v. Montalvo*, 986 A.2d 84, 100 (Pa. 2009)). To support a voluntary manslaughter verdict, "the evidence would have had to demonstrate that, at the time of the killing, [a]ppellant acted under a sudden and intense passion resulting from serious provocation by the victim." *Id.* (quoting *Montalvo*, 986 A.2d at 100) (alteration in original). To determine "whether there was sufficient provocation to create uncontrollable passion in a reasonable person, we determine whether the killer actually acted in the heat of passion, whether the provocation [led] directly to the slaying of the person responsible for the provocation, and whether the killer had sufficient cooling off time." *Commonwealth v. Martin*, 5 A.3d 177, 186 (Pa. 2010). We will reverse a trial court's decision to deny a requested jury instruction "only when it abused its discretion or committed an error of law." *Commonwealth v. Baker*, 24 A.3d 1006, 1022 (Pa.Super. 2011) (quoting *Commonwealth v. Galvin*, 985 A.2d 783, 798–99 (Pa. 2009)).

Here, there was evidence that the victim and Page engaged in a fight prior to the shooting, and that the victim instigated the fight. The victim may have said something about Page's brother or a "baby mama," and the victim was walking toward Page at the time of the shooting. Such comments would not justify a heat of passion jury instruction. There is no evidence that "there was sufficient provocation to create uncontrollable passion in a reasonable person." *See Martin*, 5 A.3d at 186. The court did not abuse its discretion or err when it denied Page's request.

Page next argues that the trial court failed to award the credit for all of the time he served after his arrest until the date of sentencing. He states that "[a]lthough the trial court directed that all of the credit be spread over the two revocation dockets, a review of the sentencing order shows that all of the days were credited at only one revocation docket . . . even though the amount of credit exceeded the maximum sentence at this docket." Page's Br. at 28. He further argues that the court miscalculated the credit and that additional days "should have been credited to his other revocation docket . . . or the instant docket." Page's Br. at 32.

A claim that the trial court failed to award credit for time served prior to sentencing is a challenge to the legality of the sentence. *Commonwealth v. Johnson*, 967 A.2d 1001, 1003 (Pa.Super. 2009). A trial court must order credit for time served "for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based." 42 Pa.C.S.A. § 9760(1). This includes "credit for time spent in custody prior to trial, during trial, pending sentence, and pending the resolution of an appeal." *Id.*

Page supplemented the record in this case with the sentencing orders from his revocation dockets. The orders reflect that the court ordered credit for time served at only one of the two revocation dockets. In that case, the court sentenced Page to a maximum of one year in jail, and ordered that he was to receive credit for time served of 433 days, *i.e.*, more than one year. However, the excess days were not applied against the sentence in either the

second revocation docket or, more relevant to this appeal, the present case. Page has therefore not received credit "for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed." We therefore vacate the sentence in this case and remand to the trial court to determine the amount of credit Page has not received and to apply the credit due.

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/3/2020