J-S81020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BOBBY YOUNG | |
| Appellant | No. 2556 EDA 2015 |

Appeal from the Judgment of Sentence July 28, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0004642-2014

BEFORE:  BOWES, J., MOULTON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MOULTON, J.:                **FILED JANUARY 19, 2017**

Bobby Young appeals from the July 28, 2015 judgment of sentence entered in the Delaware County Court of Common Pleas following his convictions after a bench trial for recklessly endangering another person and endangering the welfare of children.[1]  We affirm.

The well-reasoned opinion of the Honorable Gregory H. Mallon set forth a detailed factual and procedural history underlying this appeal, which we adopt and incorporate herein.  **See** Trial Ct. Op., 3/2/16, at 1-10 ("1925(a) Op.").

Young raises the following issues on appeal:

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2705 and 4304(a)(1), respectively.

1. WHETHER THE COURT ERRED IN DENYING THE DEFENSE MOTIONS FOR ARREST OF JUDGMENT RAISED ORALLY AT SENTENCING SINCE THE VERDICTS OF GUILTY ON THE CHARGES OF RECKLESSLY ENDANGERING ANOTHER PERSON AND ENDANGERING THE WELFARE OF CHILDREN WERE AGAINST THE WEIGHT OF EVIDENCE THAT TENDED TO SHOW THAT MR. YOUNG WAS NOT NEGLIGENT IN THE MANNER IN WHICH HE SOUGHT MEDICAL TREATMENT FOR THE INFANT VICTIM.

2. WHETHER THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH GUILT BEYOND REASONABLE DOUBT ON EITHER CHARGE SINCE THE COMMONWEALTH FAILED TO ESTABLISH ALL THE ELEMENTS OF RECKLESSLY ENDANGERING ANOTHER PERSON AND ENDANGERING THE WELFARE OF CHILDREN, SPECIFICALLY WHERE THE RECORD WHOLLY REFUTES ANY CONCLUSION THAT MR. YOUNG KNOWINGLY, INTENTIONALLY OR RECKLESSLY FAILED TO SEEK PROPER MEDICAL TREATMENT FOR THE INFANT VICTIM.

3. WHETHER THE SENTENCING SCHEME IMPOSED IS ILLEGAL WHERE THE CHARGE OF RECKLESSLY ENDANGERING ANOTHER PERSON AND ENDANGERING THE WELFARE OF CHILDREN SHOULD HAVE MERGED FOR SENTENCING PURPOSES UNDER THE CIRCUMSTANCES OF THIS CASE.

Young's Br. at 7-8.

Young first argues that the trial court erred by not granting him an arrest of judgment because the weight of the evidence "slanted overwhelmingly in favor of acquittal on all counts." *Id.* at 23. According to Young, the record shows that the victim went into distress while in the care of Taniesha Smith ("Mother") and Young "show[ed] his propensity for wanting to do the right thing" by scheduling an appointment with the doctor. *Id.* at 20-21. Young's weight claim is based in large part on two contentions about the trial. First, he argues that while the charges in the criminal

information and the prosecution's asserted theory of the case were based on the allegation that Young caused violent harm to the child on or about December 14, 2013, the trial court found Young guilty on a different theory – that Young failed in his obligation to seek medical care for the victim despite evidence of the victim's serious injuries and failure to thrive over the course of months. *Id.* at 21-22.[2] Second, Young complains that with respect to both the charges in the information and the prosecution's principal theory of the case – that the victim suffered an acute injury on or about December 14 – the evidence at trial strongly suggested that it was Mother rather than Father who was at fault. *Id.* at 22-23.

_____

[2] In his brief, Young argues that a "miscarriage of justice" occurred because the allegations in the criminal information and the Commonwealth's opening remarks at trial focused on an "acute traumatic injury on or about the weekend of December 14th/15th, 2013." Young's Br. at 21-22. The Commonwealth responds that Young waived this argument by failing to raise it before the trial court or in his Pennsylvania Rule of Appellate Procedure 1925(b) statement. Cmwlth.'s Br. at 15. We agree with the Commonwealth.

While we understand that Young may not have known before trial that the Commonwealth would introduce the malnourishment and "failure to thrive" evidence, Young did not object to this evidence when presented by the Commonwealth, move for relief based on the Commonwealth's alleged deviation from the criminal information, or include this issue in his Rule 1925 Statement. Indeed, Young's counsel devoted a substantial portion of this closing statement to arguing that the Commonwealth had failed to prove facts sufficient to support this theory of the case. N.T. Closing, 5/1/15, at 17-19, 23-27. Therefore, Young has waived this issue. *See* Pa.R.A.P. 1925(b)(4)(vii); *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived.").

Preliminarily, we must determine whether Young preserved his weight of the evidence claim for review, as Young's motion for arrest of judgment before sentencing was a motion for extraordinary relief pursuant to Pennsylvania Rule of Criminal Procedure 704.[3] The comment to Rule 704 specifically states that "the making of a motion for extraordinary relief does not, of itself, preserve any issue raised in the motion, nor does the judge's denial of the motion preserve any issue." Pa.R.Crim.P. 704, cmt. This Court has held that motions for extraordinary relief are not "a 'substitute vehicle' for raising a matter that should be raised in a post-sentence motion." *Commonwealth v. Grohowski*, 980 A.2d 113, 115-16 (Pa.Super. 2009).

We conclude that Young waived his weight of the evidence claim. Pennsylvania Rule of Criminal Procedure 607 sets forth the requirements for preserving a weight of the evidence challenge:

> (A) A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:
>
>> (1) orally, on the record, at any time before sentencing;
>>
>> (2) by written motion at any time before sentencing; or

_____

[3] In its opinion, the trial court notes that Young's oral motion for arrest of judgment appeared to combine a motion for an arrest of judgment based upon sufficiency of the evidence and a motion for a new trial based upon the weight of the evidence under Pennsylvania Rules of Criminal Procedure 606 and 607. *See* 1925(a) Op. at 11. The record shows, however, that Young orally moved for extraordinary relief – in the form of an arrest of judgment – pursuant to Pennsylvania Rule of Criminal Procedure 704(b). N.T. Sentencing, 7/28/15, at 13.

(3) in a post-sentence motion.

Pa. R. Crim. P. 607(A). Here, the record shows that Young did not file a written motion, before or after sentencing, challenging the weight of the evidence. Further, Young's oral motion for extraordinary relief did not challenge the weight of the evidence.[4] Had Young wanted to challenge the weight of the evidence, he could and should have done so through a separate oral motion at sentencing or by written motion either before or after sentencing. In these circumstances, we conclude that Young did not preserve his weight of the evidence challenge and therefore waived this claim.[5]

_____

[4] Rather, in support of the motion, Young introduced **new** evidence. These new facts could not be considered when determining whether the verdict was against the weight of the evidence.

The trial court also considered the motion in terms of sufficiency of the evidence, rather than the weight of the evidence. The trial court explained its reasoning for denying the motion:

> I'm denying your Motion for Extraordinary Relief based on, you know, the reasons I've said, that the records are replete with evidence that this child was -- there was a breach of a duty of care and on the Recklessly Endangering [Another Person] there was reckless, sufficient reckless[ness] displayed on the part of [Young.] He understands I'm not putting the blame on him for an intentional injury. I found him not guilty of that one. There was not enough evidence.

N.T. Sentencing, 7/28/15, at 30.

[5] Even had the trial court addressed Young's weight of the evidence claim, which it did not, Young's waiver would still stand. ***See***
*(Footnote Continued Next Page)*

Young next argues that the Commonwealth presented insufficient evidence to convict him. Young once again contends that the victim was not in his care when the injuries manifested and "[t]here is not a scintilla of proof from any witness or from the medical records that would allow any fact finder to reasonably conclude that [Young] abused his child during the time frame at issue." Young's Br. at 26-27.

This Court's standard for reviewing sufficiency of the evidence claims is as follows:

> We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.
>
> The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact[-]finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*(Footnote Continued)* ───────────────

**Commonwealth v. Lofton**, 57 A.3d 1270, 1273 (Pa.Super. 2012) ("Failure to properly preserve [a weight of the evidence] claim will result in waiver, even if the trial court addresses the issue in its opinion.")

*Commonwealth v. Rodriguez*, 141 A.3d 523, 525 (Pa.Super. 2016) (quoting *Commonwealth v. Tarrach*, 42 A.3d 342, 345 (Pa.Super. 2012)).

In its opinion, the trial court set forth the relevant elements of the offenses, addressed Young's claims, and properly determined that the evidence was sufficient to maintain the convictions. *See* 1925(a) Op. at 13-19. The evidence presented by the Commonwealth showed failures by Young, over a period of months, to take any action with respect to the victim's welfare and that these failures recklessly subjected the victim to serious bodily injury. After reviewing the briefs, the record, and the trial court's opinion, we affirm based on the trial court's reasoning. *See id.*

Finally, Young argues that his convictions should have merged for sentencing purposes. According to Young, the trial court's citation of *Commonwealth v. Martir*, 712 A.2d 327 (Pa.Super. 1998), was misguided because the appellant in *Martir* committed each crime by separate acts, whereas here "the elements of recklessly endangering another person are completely subsumed within the duty requirement of [endangering welfare of children]." Young's Br. at 33. Young asks this Court to reconsider its decision in *Martir* and "find that merger was proper under the facts presented in this appeal." *Id.* Merger is a pure question of law over which we exercise plenary review. *Commonwealth v. Pettersen*, 49 A.3d 903, 911 (Pa.Super. 2012).

We conclude that *Martir* is controlling and affirm the trial court. In its opinion, the trial court aptly cited *Martir* for the proposition that

endangering the welfare of children is neither a lesser-included offense nor a greater-included offense of recklessly endangering another person. 1925(a) Op. at 20-21 (citing **Martir**, 712 A.2d at 329-30). While **Martir** was decided before our legislature enacted the statutory merger analysis under 42 Pa.C.S. § 9765,[6] the decision analyzed the statutory elements of each offense as required by the test that section 9765 later codified:

> Appellant's argument must fail because every element of endangering the welfare of children is not subsumed in the elements of reckless endangerment. First, and most importantly, a conviction for endangering the welfare of children requires proof that the accused acted "knowingly," i.e., that the accused not only knew that he has a duty to protect the child but also knew that the child was placed in

_____

[6] Section 9765 provides that "[n]o crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense." 42 Pa.C.S. § 9765. Under section 9765, courts must:

> determine whether offenses are greater and lesser-included offenses [by] compar[ing] the elements of the offenses. If the elements of the lesser offense are all included within the elements of the greater offense and the greater offense has at least one additional element, which is different, then the sentences merge. If both crimes require proof of at least one element that the other does not, then the sentences do not merge.

**Commonwealth v. Nero**, 58 A.3d 802, 806 (Pa.Super. 2012) (internal citations omitted); **see also Commonwealth v. Baldwin**, 985 A.2d 803, 835 (Pa. 2009) (finding that statutory-element test of section 9765 "focuses solely on the elements of the offenses for which a criminal defendant has been convicted").

circumstances that could threaten the child's welfare. A conviction for reckless endangerment obviously requires proof that the accused acted **only** recklessly. Thus, a person could never be convicted of endangering the welfare of a child based upon reckless conduct alone.

\* \* \*

Second, a conviction for endangering the welfare of a child requires proof that the accused is aware of his or her duty to protect the child. Reckless endangerment does not require the Commonwealth to prove that the accused has any special duty to protect his victim from harm. Once again, a conviction for the crime of endangering the welfare of a child requires proof of an element, which is not subsumed within any element of reckless endangerment.

Third, endangering the welfare of a child requires proof that the victim is "a child under the age of 18 years of age." 18 Pa.C.S.A. § 4304. Reckless endangerment does not require proof of the victim's age.

\* \* \*

Even if we were to consider endangering the welfare of children as the greater-included offense, it is obvious that the crimes do not merge. A conviction for reckless endangerment requires proof of conduct that places or may place another person in danger of death or serious bodily injury, while a conviction for endangering the welfare of children only requires proof of circumstances that could threaten the child's physical or psychological welfare. Thus, reckless endangerment requires proof of a fact that endangering the welfare of children does not. In other words, the element of conduct which places or may place a person in danger of death or serious bodily injury is not subsumed within proof that a child is placed in circumstance that could threaten the child. Thus, reckless endangerment is not a lesser-included offense of endangering the welfare of children, and the crimes do not merge.

*Martir*, 712 A.2d at 329-30 (emphasis in original) (some internal citations and quotations omitted). We conclude that this analysis is just as apt after section 9765's adoption as it was under the pre-section 9765 rubric.[7]

Further, Young's argument that *Martir* is distinguishable because the appellant in *Martir* committed two separate criminal acts is unavailing. Even if Young's conduct could be considered one criminal act for the purposes of section 9765, *Martir* focused on the elements of the crimes in question and did not address the single-criminal-act requirement of merger. Our decision in *Martir* did not turn on the facts of that case.

Judgment of sentence affirmed.

_____

[7] "[B]oth this Court and the Pennsylvania Supreme Court historically have struggled to articulate and apply the proper test for merger claims." *Commonwealth v. Raven*, 97 A.3d 1244, 1249-50 (Pa.Super.), *app. denied*, 105 A.3d 736 (Pa. 2014) (describing history of merger tests in Pennsylvania). However, despite the changes in merger analysis, all merger tests (before and after section 9765) have included a comparison of the statutory elements in the greater- and lesser-included offenses. *See, e.g., Commonwealth v. Anderson*, 650 A.2d 20, 24 (Pa. 1994) ("Our inquiry . . . is whether the elements of the lesser crime are all included within the elements of the greater crime, and the greater offense includes at least one additional element which is different, in which case the sentences merge, or whether both crimes require proof of at least one element which the other does not, in which case the sentences do not merge.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/19/2017</u>

TCO S81020-16

# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

**COMMONWEALTH OF PENNSYLVANIA** | NO.     4642-14

      **v.**

**BOBBY YOUNG**

### OPINION

Mallon, J.                                                    Filed:  **3-2-16**

### I. FACTUAL AND PROCEDURAL HISTORY

Bobby Young (hereinafter "Appellant"), appeals from the judgment of sentence imposed on July 28, 2015. The relevant facts and procedural history of Appellant's case follow.

The minor male victim in this case, S.Y., was born on July 23, 2013 and weighed 3.43 kilograms at birth, or 7.56 pounds.[1]. After his birth, Taniesha Smith, S.Y.'s mother, and S.Y.'s father, Bobby Young (hereinafter "Appellant"), lived in Upper Darby, Pennsylvania and shared the responsibility of taking care of S.Y. *Id.* 18-20. Initially, Taniesha undertook most of the responsibility of looking after S.Y. *Id.* at 21. According to Taniesha, he was primarily breastfed. *Id.* At trial in the instant matter, Taniesha explained that she had a C-section and was very ill after giving birth to S.Y. *Id.* at 22. This kept her in bed for almost two weeks following his birth. *Id.* According to Taniesha, S.Y. put on weight during this time and was healthy. *Id.* at 118-20.

Taniesha testified that, following his birth, she initially made a well-visit appointment for S.Y. for July 30, 2013, but he was not taken to the appointment because she was ill. *Id.* at 22-23. She explained that she could not physically get up and take him, and described that she was in a lot of pain during this time. *Id.* at 23. Taniesha explained that after S.Y. missed that appointment, the Appellant told her that he would like the child to see an "original man doctor." *Id.* at 24-27.

---

[1] S.Y.'s medical records reflect that his birth weight was 3.43 kg. *See* Commonwealth Exhibit C-2 at p. 26 Tanisha testified at trial that S.Y. weighed 7.8 pounds at birth. N.T., 4/23/15, p. 114.

1

She explained that an original man doctor "is someone of like an African or an Indian, you know, native decent." *Id.* at 24. She did not make an appointment with such doctor.

Eventually, Taniesha returned to work on October 18, 2013. *Id.* at 23. She told the court that S.Y. was not taken to a doctor before she returned to work. She stated, "I regret that I did not take him to the doctor. I regret it every day." *Id.* at 29.

When Taniesha returned to work, the Appellant was not working so he took over the care of S.Y. during work hours. *Id.* at 30. Taniesha, a registered nurse, worked several jobs and shifts, including a 7 P.M. to 7 A.M. nightshift at Pennsylvania Hospital, and dayshift work every third weekend of the month. *Id.* at 18, 31-32. She also worked *per diem* with Bayada Nursing from time to time. *Id.* At the time Taniesha returned to work, S.Y. was sleeping through the night, from approximately 8:45 P.M. to 5:45 A.M. *Id.* at 34. S.Y. also napped during the day. *Id.*

According to Taniesha, the Appellant would "get frustrated easily, you know, with S.Y. if he were crying." *Id.* at 33. Taniesha explained that the Appellant disapproved of S.Y.'s thumb-sucking, and would "pluck him" when he did this. *Id.* at 35. Taniesha testified at trial that the Appellant "would smack [S.Y.'s] hand out of his mouth to get him to stop sucking his thumb." *Id.* at 35. Taniesha could not recall how many times she had witnessed the Appellant do this, but stated that it was "probably, maybe [in the] single digits." *Id.* at 37. Taniesha testified that the Appellant would tell the baby to "shut the fuck up." *Id.* at 38. Taniesha recalled an incident several months prior to December of 2013 where the Appellant told her that S.Y. had fallen off the couch onto their carpeted the floor when she had been at work. N.T., 4/24/15, pp. 4-5.

According to Taniesha, the Appellant was S.Y.s primary caregiver when she was at work. N.T., 4/23/15, p. 30. She explained that when she returned home from work in in the evening, the Appellant would leave and she would resume care of S.Y. and put him to bed. The Appellant

2

would return again in the morning when she went to work.[2] *Id.* at 32-50.

On Friday December 13, 2013, Taniesha worked from 8 A.M. to 4:30 P.M. *Id.* at 40-41. When she returned home from work that night, she resumed care of S.Y. *Id.* at 42. The following day, December 14, 2015, Taniesha worked at Pennsylvania Hospital from 7 A.M. until 7 P.M. and the Appellant took care of S.Y. *Id.* at 43. After her 12 hour shift, Taniesha returned home and relieved the Appellant from caring for S.Y. *Id.* at 44. S.Y. was awake at this time, and after the Appellant left, Taniesha got herself and S.Y. ready for bed and went to sleep, as she generally did. *Id.* at 44-46, 50. She recalled that this was between 10:30 P.M. and 11 P.M. *Id.* at 47.

The next morning, Saturday, December 14, 2013, Taniesha awoke around 5:15 A.M. and tended to S.Y. before she left for work. She had to be at work at 7 A.M. As usual, when Taniesha was at work S.Y. was in the Appellant's care. Taniesha returned home from work between 8:30 P.M. and 9:30 P.M. Nothing remarkable was observed this day. *Id.* at 40-48.

After the Appellant left that evening, Taniesha got herself and S.Y. ready for bed and went to sleep. *Id.* at 44-46, 50. At approximately 3 A.M. Sunday morning, Taniesha was awoken by S.Y. *Id.* at 48. She gave him a bottle and he went back to sleep. *Id.* at 48. Sometime later S.Y. awoke for a second time and "was fussy, you know, had difficulty, you know, falling back to sleep." *Id.* at 49. At 5:15 A.M. Tanisha's alarm clock went off. *Id.* at 50. By this time, the Appellant had returned to the house. *Id.* at 50.

Taniesha went work that day, Sunday, December 15, 2013. Again she had to be at work at 7 A.M. When she returned home that evening around 9 P.M., the Appellant told her that "sometimes -- I see sometimes you have to be rough with S.Y. because he fights sleep." *Id.* at 50-

---

[2] The Appellant similarly testified that if he was home he would take care of S.Y., and if Taniesha was home, she would take care of him. N.T., 4/24/15, p. 48.

3

52. The Appellant told her that he looked at S.Y., held him up so they were face-to-face, and said go to sleep. *Id.* at 53. The Appellant told Taniesha that he had thrown S.Y. onto the bed. *Id.* at 54. Upon hearing this information, Taniesha ran upstairs to check on S.Y. *Id.* at 54. She observed him sleeping peacefully in his Pack-N-Play. *Id.* Taniesha then got herself ready for bed and prepared a bottle for S.Y. in case he woke up during the night and was hungry. *Id.* at 54-55. She then went to bed.

S.Y. awoke crying sometime between 11 P.M. and 1 A.M. that evening. *Id.* at 55. Tanisha took S.Y. from his Pack-N-Play and brought him into bed with her to give him his bottle. *Id.* When he got three-fourths through his bottle, S.Y. began vomiting. *Id.* at 55. After she cleaned up the vomit, Taniesha picked S.Y. up to burp him, and he vomited a second time. *Id.* at 56. Taniesha cleaned up the mess again, and S.Y. vomited for a third time. *Id.* After this, Taniesha cleaned up S.Y. and put him in clean clothes and put him back down to go to sleep. *Id.*

S.Y. was eventually taken by both the Appellant and Taniesha to Children's Hospital of Philadelphia (hereinafter "CHOP") on Tuesday, December 17, 2013. At trial, two different versions of the events leading up to his admission were provided.

**(a) Appellant's Version of the Events Surrounding S.Y's Admission to CHOP**

According to the Appellant, when Taniesha and her daughter got home on the evening of Sunday, December 15, 2013, he noticed that Shayla, Taniesha's daughter, had a cold. N.T., 4/24/15, pp. 48-51. The Appellant was worried that S.Y. might catch her cold, and shared his concerns with Shayla and Taniesha. *Id.* at 51-52. He told Shayla not to get too close to S.Y. because she had a cold. *Id.* at 52. When they had settled in, the Appellant placed S.Y. in his bouncer and he left the house. *Id.* at 53. According to the Appellant, S.Y. appeared to be fine when he left. Approximately two hours later, the Appellant received a call from Taniesha and

4

she told him that S.Y. had thrown up. *Id.* at 53. The Appellant testified that he didn't think too much of this information until Taniesha called for a second time to tell him that S.Y. had thrown up again. *Id.* at 54. The Appellant testified that after that call he returned home, at approximately 1:00 AM. *Id.* at 54, 55. When he got home, S.Y. was asleep in his Pack-N-Play. *Id.* The Appellant asked Taniesha if she thought that S.Y. had caught Shayla's cold, and she responded she didn't know. *Id.* at 55. According to the Appellant, at this point, he and Taniesha agreed that if S.Y. threw up again, they would take him to the hospital. *Id.* at 55-56.

According to the Appellant, the next morning he awoke first and took S.Y. downstairs and gave him a bottle. *Id.* at 56-57. When he burped S.Y., S.Y. threw up on his shoulder. *Id.* at 58. According to the Appellant, he wiped S.Y. down and changed his clothes, woke up Taniesha, and they all went to the hospital. *Id.* at 58. The Appellant did not stay in the hospital for the entire duration of S.Y.'s stay. He told the court that after he was informed that S.Y. had a brain bleed he confronted Taniesha about bumping his head against the doorframe. *Id.* at 72-73, 95-107. The Appellant stated that he told the hospital staff this information as well. *Id.* at 74. According to the Appellant, there was a second instance where S.Y. hit his head against a shelf in their bedroom when Taniesha was holding him. *Id.* at 106. He denied throwing S.Y. on the bed or playing rough with him. *Id.* at 107-08, 113. The Appellant explained that he played with S.Y. gently on the bed. *Id.*

The Appellant testified that he didn't know what an "original man doctor" was and denied ever expressing any wish for S.Y. to see one. *Id.* at 71. He explained that he did not know that the child was required to have a hospital visit right after his birth, and stated that Taniesha told him that she had taken care of scheduling a two month appointment for him. *Id.* at 88. It was some time later that the Appellant discovered that S.Y. did not go to that appointment.

5

*Id.* at 89. According to the Appellant, Taniesha told him that the doctor whom she had scheduled S.Y. to go to would not give him any shots, so the Appellant made a new appointment for S.Y. with a doctor on West Chester Pike. *Id.* at 90-91. According to the Appellant, he made that appointment when S.Y. was about two months old.[3] *Id.* at 91. According to the Appellant, the appointment was scheduled for some time in December and the doctor assured him that he would get S.Y. caught up with his shots when he was brought in. *Id.* at 94-95. The Appellant explained that this was the first available appointment when he called the doctor's office. *Id.* at 94.

### (b) Tanisha's Version of the Events Surrounding S.Y's Admission to CHOP

According to Taniesha, S.Y. awoke on Monday, December 16, 2013, around 9 A.M. *Id.* at 56. S.Y. was lethargic and Taniesha kept him close to her throughout the day, checking his vital signs and taking his temperature in an attempt to figure out what was wrong with him. *Id.* Taniesha believed that S.Y. had a stomach bug. *Id.* at 134. When his symptoms had not improved by that evening, Taniesha decided that it was necessary to take S.Y. to the hospital. *Id.* at 66. Ultimately, on the next day, December 17, 2013, in the morning, Taniesha and the Appellant took S.Y. to Emergency Room at the Children's Hospital of Philadelphia (hereinafter "CHOP"). *Id.* at 68-70. When S.Y. was admitted to the hospital, he weighed 12 lbs. 9.1 oz., and was in the first percentile or third percentile in weight for his age group.[4] *Id.* at 120; *See also* Commonwealth Exhibit C-2, pp 1-2, 19. S.Y. appeared "thin and pale" upon admission. *Id.* at 3. At birth, S.Y. was in the 50th percentile for weight, and had dropped to the first or third percentile upon his admission to CHOP. *Id.* at pp. 2, 19. At nearly five months, S.Y. had gained only five

---

[3] If this occurred approximately two months after S.Y.'s birth, then this call would have been made sometime in September 2013 and the appointment would have been scheduled some two and half months after that, which the court calculated as December 2013.

[4] The records showed that S.Y. was in the 1st or 3rd percentile for weight at the time of his admission to CHOP in various parts of the medical records. *C.f.,* Commonwealth Exhibit C-2, pp. 2, 19; Commonwealth Exhibit C-2, p. 54.

6

lbs. S.Y.'s weight was so low that his doctors described his condition as a "failure to thrive." *Id.* at 1. Overall, at admission to CHOP, S.Y. was in the 1st percentile for weight, 2nd percentile for body length and 1st percentile for head circumference. *Id.* at 30 ("Physical Examination" section). Additionally, S.Y. had missed his 2 month and 4 month immunizations. *Id.* at 2. He had not been back to the doctor since his birth.

While at the hospital, Taniesha and the Appellant accompanied S.Y. to the triage area as the hospital staff tended to him. Taniesha left the hospital around 2 P.M., picked up her daughter from school, and then returned to the hospital with her daughter. N.T., 4/23/15, p. 76. The Appellant remained at the hospital during this time. S.Y. was administered some antibiotics and given a CAT Scan. *Id.* at 78. Eventually, S.Y. was then taken to the ICU. *Id.* at 79. Taniesha and the Appellant remained with S.Y. at the hospital and Taniesha recalled that at some point, S.Y. stopped breathing. *Id.* at 79-80. Taniesha also recalled that at some point the Appellant asked if she would "mind if [he left to] go get some money that somebody owe[d ] [him]." *Id.* at 83. A verbal argument ensued and the Appellant took Taniesha's keys and left the hospital. *Id.* at 85. This occurred at approximately 9 P.M. that evening. *Id.* at 86.

According to Taniesha she spent that night in the hospital room with S.Y. *Id.* at 87. At some time that evening S.Y. began to have seizures in his crib and a doctor was summoned. *Id.* at 88. S.Y. was given medication and eventually became stable. *Id.* S.Y. remained in the hospital for 14 days. *Id.* at 93. Taniesha called out of work and spent most of that time at the hospital with S.Y. *Id.* at 94. The Appellant was there "sporadically." *Id.* at 95.

On December 23, 2013, Taniesha was contacted by detectives who asked if they could speak to her. *Id.* at 97; N.T., 4/24/15, p. 27. She was interviewed in a conference room at the hospital at approximately 10:30 A.M. that morning and then returned to the room with S.Y. N.T.,

7

4/23/15, p. 98. At some point before she spoke to the police, the Appellant asked Taniesha if S.Y.'s injuries could have been caused during an incident where she had "banged his head against the doorframe in [their] bedroom." *Id.* at 103, 168. Taniesha was astonished by this question and refused to respond. According to Tanisha, another conversation between herself and the Appellant occurred after she spoke to the police where she asked the Appellant about throwing S.Y. on the bed and she asked him if he thought that could have caused S.Y.'s injuries. *Id.* at 159-67.

After two weeks at CHOP, S.Y. was released to a pediatric rehab in Marlton, New Jersey. *Id.* at 99. Taniesha stayed overnight at the rehab center with S.Y. for several weeks. *Id.* at 106-07. She would leave for work in the morning and return there in the evenings. *Id.* at 108-09.

In January 2014, Children and Youth Services (hereinafter "CYS") became involved in the matter of S.Y. and took custody of him. *Id.* at 106-08. At trial, Detective William Sminkey of the Upper Darby Township Police Department testified that he became involved in the case after he was contacted by CYS. N.T., 4/24/15, p. 10. Detective Sminkey received a report from CYS that indicated that S.Y. had a "recent acute event." *Id.* at 23. The report further indicated that there was concern about "a repetitive shaking event" based upon retinal hemorrhages found in S.Y.'s eye. *Id.* Of further concern was the fact that S.Y. had not received any primary care since he was discharged from the hospital following his birth. *Id.* at 23-24.

Detective Sminkey i terviewed Taniesha at CHOP and the Appellant at his residence in Upper Darby on December 23, 2013. *Id.* at 12-13, 18, 22. Upon his arrival at Appellant's residence in Upper Darby, Detective Sminkey went over a "non-custodial form" and advised the Appellant that he was not in custody and could end the questioning at any time. *Id.* at 13; *see* Commonwealth Exhibit C-3. After they went over the form, the Appellant provided a written

8

statement. The Appellant told Detective Sminkey that he watched S.Y. when Taniesha was at work and admitted that he "playfully" throws S.Y. on the bed from time to time. N.T., 4/24/15, p. 17. The Appellant told Detective Sminkey that Taniesha had accidentally "slammed" S.Y.'s head against a door frame on another occasion. *Id.* Following Detective Sminkey's investigation, Taniesha and the Appellant were both charged with endangering the welfare of a child.[5] *Id.* at 19.

At the Appellant's trial, the Commonwealth and the defense stipulated to the authenticity of S.Y.'s medical records. They further stipulated that if Dr. Stephanie Duestch were called to testify, she would opine as follows:

> S.Y. was admitted to the hospital on December 17, 2013 and had suffered a subdural hemorrhage. S.Y. was admitted to the hospital on December 17 and had suffered a brain bleed. S.Y. when admitted to the hospital on December 17, had suffered retinal hemorrhaging. These injuries were indicative of non-accidental trauma.

N.T., 4/24/15, p. 38; *see also* Commonwealth Exhibit C-1.

The medical records show that S.Y. had multiple intracranial subarachnoid and subdural hemorrhages. *See* Commonwealth Exhibit C-2, page 78. Overall, his records showed evidence of subarachnoid and subdural and hemorrhage, bilateral renal hemorrhage, right subdural hematomas, and seizures. *Id.* at 6, 29, 63, 76. A MRI showed evidence of several[6] older subdural hematomas as well as a subarachnoid hemorrhage, but the age of the latter injury was not evident in the record. *Id.* at 10, 37. Intra retinal hemorrhages were "too numerous to count." *Id.* at 55. The records reflected both old and "fresh" hemorrhages. *Id.* Posterior pole hemorrhages appeared to be consistent with repetitive shaking injury. *Id.* Additionally, the appearance of both new and older retinal hemorrhages indicated that this shaking had occurred from repeat events. *Id.* at 56.

---

[5] The Appellant went to trial on simple assault, endangering the welfare of children, and recklessly endangering another person. The charges against Taniesha were withdrawn.

[6] *See* Commonwealth Exhibit C-2, page 24 ("suspicion of a possible small nonacute right subdural hematoma/collection"). *See also* page 37.

9

These findings were highly suggestive of "nonaccidental trauma." *Id.* at 117.

On February 12, 2014, S.Y. was taken in by a foster mother, April Squares, a nurse. N.T., 4/24/15, p. 147. She testified at trial that S.Y. was fed through a feeding tube and was very "delayed." *Id.* She said he had seizures ten times a day. *Id.* at 147-48. At the time of the trial, April of 2015, S.Y. was twenty-one months old and had just begun walking. *Id.* at 148. At that time, his seizures had reduced from ten to three times a day. *Id.* at 148-49. Regarding his overall health, April testified that "[h]e has a traumatic brain injury, so that will cause impulsiveness for the rest of his life. He is still delayed, not eating regular food like he should be and he has – he's been diagnosed with Lennox Gastaut Syndrome which is [a] seizure disorder that will affect him his entire life." *Id.* at 156

Following a two day non-jury trial, this court found Appellant guilty of endangering the welfare of a child and recklessly endangering another person and found him not guilty of simple assault as there was not sufficient evidence offered to convince the court beyond a reasonable doubt that he personally caused the horrible *traumatic* internal injuries suffered by the child.

On July 28, 2015 Appellant was sentenced to an aggregate sentence of 21 months to 42 months, as well as 2 years of consecutive probation. The Appellant was found not to be RRRI eligible, was given credit for time served, and was ordered to attend parenting classes.

On August 21, 2015, Appellant filed a *pro se* notice of appeal. Trial counsel then perfected the appeal and petitioned this court to withdraw as counsel, and alternate appellate counsel was appointed. Following a directive from this court, Appellant filed a 1925(a) statement.[7] Appellant sets forth the following issues in his Concise Statement of Matters Complained of on Appeal:

---

[7] Because the Office of the Public Defender needed time to review the case, this court granted a request for the filing of counsel's 1925(b) statement.

(1) The Court erred in denying the defense motions for arrest of judgment raised orally at sentencing since the verdicts of guilty on charges of Recklessly Endangering Another Person and Endangering the Welfare of Children were against the weight of the evidence that tended to show that Mr. Young was not negligent in the manner in which he sought medical treatment for the infant victim.

(2) The evidence was insufficient to establish guilt beyond a reasonable doubt on either charge since the Commonwealth failed to establish all the elements of Recklessly Endangering Another Person and Endangering the Welfare of Children, specifically whether Mr. Young knowingly, intentionally or recklessly failed to seek proper medical treatment for the infant victim.

(3) The sentencing scheme imposed is illegal where the charge of Recklessly Endangering Another Person and Endangering the Welfare of Children should have merged for sentencing purposes under the circumstances of this case.

## II. DISCUSSION

### A. Arrest of Judgment

Appellant first claims that the court erred in denying counsel's motion for arrest of judgment. [8]

> In reviewing a refusal to arrest judgment, we must consider whether the evidence was sufficient to uphold the verdict of the trial court. We must accept all the evidence and all reasonable inferences which may be drawn from that evidence upon which the fact finder could have based its verdict. If the evidence viewed in the light must favorable to the verdict winner is not sufficient to establish guilty beyond a reasonable doubt of the crime charged, then the motion should have been granted.

*Commonwealth v. McFadden*, 547 A.2d 774, 775 (Pa. Super. 1988). In a bench trial, as in a jury trial, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Zingarelli* 839 A.2d 1064, 1069 (Pa. Super. 2003).

---

[8] Pennsylvania Rule of Criminal Procedure 606 now refers to a challenge to the sufficiency of evidence as a motion for judgment of acquittal. In addition, the Appellant seems to combine in his "Motion for Arrest of Judgment" a request for the court to exercise its discretion [and grant a new trial] because its verdict was against the weight of the evidence *See* Pa. R. Crim. P. 607

11

In the case *sub judice*, Appellant was found guilty of recklessly endangering another person and endangering the welfare of children. At trial the Commonwealth presented competent evidence that the Appellant as S.Y.'s father was responsible for the care and well-being of his son, S.Y. The child was extremely underweight while in his care and had somehow suffered serious and substantial cranial injuries, i.e., several older subdural hematomas, On admission to the Emergency Room S.Y. presented with " altered mental status and seizures, which are likely secondary to *chronic* (emphasis added) injury caused by right subdural hematoma. *See* Commonwealth Exhibit C-2, pp. 24, 37. Moreover, the Appellant admitted that he knew the child hit his head on a door frame and on a shelf. N.T. 4/24/15, pp. 72-73, 106. The court found that it was a reasonable inference that S.Y. had been exhibiting behaviors consistent with this "chronic injury" and consistent with significant retinal bleeding, as well as from the lack of sufficient nourishment, and that a reasonable parent would have acted and sought medical attention for the child long before they did. 18 Pa.C.S.A. § 4304. The Appellant knowingly violated his duty of care by not taking his newborn to a doctor at any time following his birth until the child was *in extremis*. The Appellant ignored the fact that the child was not thriving. Add to this any behaviors or lack of behaviors that were consistent with S.Y.'s "altered mental status and seizures, which are likely secondary to *chronic* (emphasis added) injury caused by right subdural hematoma" and retinal hemorrhages "too numerous to count."[9] *See* Commonwealth Exhibit C-2, p. 55

---

[9] The child also had subarachnoid hematoma, and an additional retinal hemorrhage. The ages of these are not clearly stated in the medical records. The trauma causing these injuries could have occurred immediately prior to the child being brought to the emergency room at CHOP or it could have happened contemporaneously with the earlier subdural hematomas and retinal hemorrhage. We do not know. Accordingly they were not factored into the court's decision.

12

The Appellant's conduct, i.e., his failure to secure the required medical care that S.Y. needed and his failure to provide sufficient nourishment for his child, was reckless and it placed S.Y. in danger of death and did cause serious bodily injury to him. 18 Pa.C.S.A § 2705. *Commonwealth v. Cottam*, 616 A.2d 988 (Pa. Super. 1992). At trial the Appellant testified that he had two grown children, so despite his testimony at trial, it cannot be said that he had no knowledge or prior experiences with caring for an infant.

Respectfully, the evidence was sufficient to uphold this court's verdict. The court respectfully submits that its denial of Appellant's motion for arrest of judgment was not an abuse of discretion.

### B. Sufficiency of the Evidence

Next, Appellant challenges the sufficiency of the evidence for his convictions of recklessly endangering another person and endangering the welfare of children.

In determining whether the evidence is sufficient to support a defendant's conviction, the reviewing court will consider the evidence admitted during the trial along with any reasonable inferences that may be drawn from that evidence in the light most favorable to the Commonwealth as the verdict winner. If the court finds, based on that review, that the fact finder could have found every element of the crime charged beyond a reasonable doubt, then it must sustain the conviction. *Commonwealth v. Murphy*, 577 Pa. 275, 284, 844 A.2d 1228, 1233 (2004) (citations omitted). A reviewing court may not re-weigh the evidence and substitute its own judgment for that of the fact-finder. *Commonwealth v. Jones*, 874 A.2d 108, 120-21 (Pa.Super. 2005), *quoting Commonwealth v. Bullick*, 830 A.2d 998, 1000 (Pa. Super. 2003).

13

In the case *sub judice*, this court, sitting as fact-finder, was tasked with weighing the evidence and making all credibility determinations in this case. The court submits that the evidence was more than sufficient to sustain its verdict.

**(1) Recklessly Endangering Another Person**

Appellant first claims that the evidence was insufficient to find him guilty of recklessly endangering another person. In Pennsylvania, a person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury. 18 Pa.C.S.A. § 2705. The *mens rea* for recklessly endangering another person is a conscious disregard of a known risk of death or great bodily harm to another person. *Commonwealth v. Hopkins*, 747 A.2d 910 (Pa. Super. 2000). "Recklessly" is defined as follows:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3).

"Serious bodily injury" supporting conviction for recklessly endangering another person is bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. *Commonwealth v. Martuscelli*, 54 A.3d 940 (Pa. Super. 2012). Lastly, acts of commission or omission by parents towards their children may create substantial risk of death or great bodily harm so as to allow conviction of parents for recklessly endangering another person. *Commonwealth v. Cottam*, 616 A.2d 988, (Pa. Super. 1992).

Based upon the evidence presented, this court found that the elements of this crime had

14

been proven beyond a reasonable doubt. Namely, the court found that the Appellant acted recklessly by consciously disregarding the child's deteriorating physical condition over the course of his first four and one-half months of life. Any reasonable person in the Appellant's shoes would have taken S.Y. in for a check-up during this time. Moreover, any reasonable person would have sought medical treatment for a child that had gained only slightly over five (5) pounds in four and on half months, dropping from the 50th percentile in weight at birth to the 1st or 3rd percentile on admission to the emergency room four months later. Finally, this court found that a child with multiple subdural hematomas would have exhibited behaviors that a reasonable person would know required medical attention. Add to this any behaviors that may have arisen from the retinal bleeding. The evidence shows that the Appellant's failure to take the child to the doctor was reckless and a gross deviation from what a reasonable person would have done.

A further review of the medical records revealed that S.Y. was significantly underweight at the time he was admitted to CHOP. S.Y.'s weight was so low that his doctors described his condition as a "failure to thrive." *See* Commonwealth Exhibit C-2, p. 1. Overall, S.Y. was in the first percentile for weight, first percentile for head circumference and second percentile for body length. *Id.* at 30. He weighed 7.56 lbs. at birth, and four months and two weeks later, had only gained four pounds. *See* Commonwealth Exhibit C-2, p. 26. It is clear from the evidence that S.Y. was not being given enough food to thrive. The evidence reveals that S.Y. was given a nasal gastric tube upon his admission to CHOP, and that this tube was not removed for several months, as testified to by his foster mother. N.T. 4/24/15, p. 150 (noting that S.Y. was tube fed for three months.). This court believes that this evidence indicates that S.Y. was not being properly fed during the four and one half months leading up to his admission to CHOP. It was evident to this

court that he was not thriving and putting on weight as he should have been. S.Y.'s mother, Taniesha, testified that the she believed S.Y. was gaining weight and was healthy. N.T., 4/23/15, pp. 118-20. In addition to her testimony at trial, the medical records indicate that Taniesha told the emergency room nurse at admission that S.Y. was a "good eater." These statements are belied by the S.Y.'s medical records and S.Y's physical condition. The above facts simply refute such a statement and calls into question Taniesha's portrayal of S.Y.'s existence as being normal and unremarkable. The court believes that it is a reasonable inference that since this infant had to be fed through a tube for several months post-hospital admission, he was not, prior to his hospitalization, accepting breast or bottle feeding sufficiently. When coupled with S.Y.'s failure to thrive, this court believes that S.Y.'s failure to take sufficient nourishment had been going on for some time before he was admitted to CHOP. Finally, this court found that the Appellant should have seen this and taken the child to a doctor long before the child fell gravely ill. The court also found that the Appellant breached his duty to his son and his failure to act was reckless and endangered his son's life.[10]

Moreover, the child had multiple "old" subdural hematomas, i.e., a bleed in the subdural portion of the brain. This court found that this was a significant and life threatening injury and often associated with shaken baby syndrome.[11] This court found that it was a reasonable inference that an infant with subdural hematomas would display obvious behaviors which should

---

[10] Maybe had Appellant been a 16 year old new father with no experience at being a father, maybe he could be forgiven for not knowing what to do. However, the Appellant has two (2) children who are now adults so it is a reasonable inference that he had some experience with infants. See N.T., 4/24/15, p. 57.
[11] Detective Sminkey testified that the Appellant explained that the doctors told him that S.Y. had torn ligaments in his neck from jerking his head and that there was blood in his brain as if it was "shaken." N.T. 4/24/15, p. 17. Additionally, he confirmed that Dr. Duestch's report indicated a repetitive shaking event based upon the retinal hemorrhages in S.Y.'s eye. Id. at 23, 36-37.

16

cause a parent great concern. S.Y. had not one, but *multiple* subdual hematomas. These would have had to have occurred at the same time or different times in this child's short life. It is a reasonable inference to assume that the child with even one—let alone multiple subdural hematomas—was not behaving like a healthy infant. The child also had retinal hemorrhaging. The medical records revealed two types of hemorrhages, some that indicate that this injury occurred close in time to S.Y.'s admission to CHOP, and older hemorrhages that seem to pre-date his admission. S.Y.'s medical records also reveal that he suffered a subarachnoid hemorrhage. There was also a renal hemorrhage noted in S.Y's records. In fairness to the Appellant, this subarachnoid hemorrhage and the renal hemorrhage were not be factored into the court's decision as the medical records did not say they were "old." *See* e.g., Commonwealth Exhibit C-2, p. 6.

Below is a list of things S.Y. suffered after birth:

- Failure to Thrive

- Multiple Subdural Hematomas

- Numerous Retinal Hemorrhages

- Altered Mental Status and Seizures

- S.Y.'s head collided with the frame of a door

- S.Y.'s head collided with bedroom shelf

- No doctor visits for 4 ½ months after birth

- No immunizations

Based upon all of this evidence, the court found that the Appellant disregarded the child's medical conditions and medical needs so much so that S.Y. suffered permanent serious bodily injury. The court respectfully submits that his conviction for recklessly endangering another

17

person should be affirmed.

### (2) Endangering the Welfare of a Child

Next, the Appellant claims that the evidence was insufficient to find him guilty of endangering the welfare of a child, which states that: "[a] parent . . . supervising the welfare of a child under 18 years of age. . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304. The *mens rea* for endangering the welfare of a child is a knowing violation of the accused's duty of care to the minor-victim. *Commonwealth v. Cottam*, 616 A.2d 988, 1005 (Pa. Super. 1992). "Knowingly" is defined as follows:

> A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. § 302(b) (2).

The Commonwealth must prove that: 1) the accused is aware of his or her duty to protect the child; 2) the accused is aware that the child is in circumstances that could threaten the child's physical or psychological welfare; and 3) the accused has either failed to act or has taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare. *Commonwealth v. Pahel*, 4689 A.2d 963, 964 (Pa. Super. 1997), citing *Commonwealth v. Cardwell*, 515 A.2d 311, 315 (Pa. Super. 1986).

According to the statute, a parent or guardian or other person supervising the welfare of a child commits an offense if he knowingly endangers the welfare of a child by violating a duty of care, protection and support. As set forth above, a person acts "knowingly" if he is aware that it is *practically certain* that his conduct will cause a particular result. 18 Pa.C.S.A. § 302(b)(2).

18

(emphasis added). Based upon the evidence presented it is clear that the Appellant knew that he had a duty to care for and protect S.Y. and should have taken him for appropriate medical care. This was not his first child. The Appellant was aware or should have been aware that it was *practically certain* that the failure to address the medical needs of S.Y. would cause harm to the child's health, or even result in the child's death. As stated above, the medical records in this case not only show that S.Y. was severely underweight, S.Y. also had significant cranial injuries. The Appellant candidly admitted that he had seen S.Y. hit his head on more than one occasion. It is evident to this court that the Appellant knowingly breached his duty to his child and endangered the child's life.

The Appellant clearly violated his duty of care in this case and should have known that not taking his child to the doctor for well-visits, vaccinations, or for examinations following these known strikes to the child's head along with the child's failure to thrive could threaten the child's physical or psychological welfare. The court respectfully submits that his conviction for endangering the welfare of a child should be affirmed.

## C. Illegal Sentence

Lastly, Appellant claims that the sentence imposed by the court was illegal in that his convictions of recklessly endangering another person and endangering the welfare of children should have merged for sentencing purposes. The court submits that this claim is without merit.

The question of whether convictions merge for the purposes of sentencing is a challenge to the legality of the sentence imposed by the lower court. *Commonwealth v. Rodriquez*, 673 A.2d 962, 967 (Pa. Super. 1996). Under Pennsylvania's merger doctrine, when a person is convicted of several crimes based on the same facts, the sentences for those crimes will not merge unless the crimes are greater and lesser-included offenses. *Commonwealth v. Duffy*, 832

A.2d 1132 (Pa. Super. 2003). According to 42 Pa.C.S.A. § 9765, the merger of sentences is prohibited unless a strict two-part test is met. "No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense." 42 Pa.C.S.A. § 9765.

In *Commonwealth v. Martir*, 712 A.2d 327 (Pa. Super. 1998), the Superior Court held that reckless endangerment and endangering the welfare of a child are not lesser included offenses and do not merge for sentencing purposes. The court stated:

> Appellant's argument must fail because every element of endangering the welfare of children is not subsumed in the elements of reckless endangerment. First, and most importantly, a conviction for endangering the welfare of children requires proof that the accused acted "knowingly," i.e., that the accused not only knew that he has a duty to protect the child but also knew that the child was placed in circumstances that could threaten the child's welfare. A conviction for reckless endangerment obviously requires proof that the accused acted *only* recklessly. Thus, a person could never be convicted of endangering the welfare of a child based upon reckless conduct alone. Accordingly, the question of "whether the elements of the lesser crime are all included within the elements of the greater crime" is answered in the negative.
>
> Second, a conviction for endangering the welfare of a child requires proof that "the accused is aware of his or her duty to protect the child.". . . Reckless endangerment does not require the Commonwealth to prove that the accused has any special duty to protect his victim from harm. Once again, a conviction for the crime of endangering the welfare of a child requires proof of an element, which is not subsumed within any element of reckless endangerment
>
> Third, endangering the welfare of a child requires proof that the victim is "a child under the age of 18 years of age." [] Reckless endangerment does not require proof of the victim's age.
>
> * * *
>
> Even if we were to consider endangering the welfare of children as the greater-included offense, it is obvious that the crimes do not merge. A conviction for reckless endangerment requires proof of conduct that places or may place another person in danger of death or serious bodily injury, while a conviction for endangering the welfare

20

of children only requires proof of circumstances that could threaten the child's physical or psychological welfare. Thus, reckless endangerment requires proof of a fact that endangering the welfare of children does not. In other words, the element of conduct which places or may place a person in danger of death or serious bodily injury is not subsumed within proof that a child is placed in circumstance that could threaten the child. Thus, reckless endangerment is not a lesser-included offense of endangering the welfare of children, and the crimes do not merge

*Martir*, 712 A.2d at 329-330 (emphasis in original) (internal citations omitted). Based upon *Martir*, the court submits that sentence imposed was entirely legal. The convictions did not merge for sentencing purposes in this case.

## III. CONCLUSION

In light of the aforementioned, it is respectfully submitted that the court's decision was free from legal error and that there is no merit to Appellant's appeal. It is for the reasons set forth above that this court respectfully submits that Appellant's Judgment of Sentence be affirmed.

BY THE COURT:

_____
GREGORY M. MALLON, JUDGE

21