J-A11045-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                               :          PENNSYLVANIA
                               :
            v.                 :
                               :
                               :
TALISHA R. BRANDAO             :
                               :
          Appellant            :  No. 621 MDA 2019

Appeal from the Judgment of Sentence Entered March 19, 2019
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0005624-2016

BEFORE:   PANELLA, P.J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:     **FILED: JUNE 1, 2020**

Appellant Talisha R. Brandao appeals the judgment of sentence entered by the Court of Common Pleas of Dauphin Count after a jury convicted Appellant of Robbery[1] and Conspiracy to Commit Robbery.[2]   After careful review, we affirm.

The factual background of this case was summarized as follows:

> At some point during the end of June [or] early July 2016, Jon Paul Young (hereinafter "the victim" []) met a woman named Josephine Kiger (hereinafter "Ms. Kiger") through a dating application.  About a month later (August 2016), [the victim] and Ms. Kiger were spending a lot of time together and [the victim] moved some of his personal belongings into Ms. Kiger's home in Steelton.  In addition to Ms. Kiger and [the victim], Ms. Kiger's two daughters, Zoie and Myla, - as well as her cousin, Matt, also

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. § 3701(a)(1)(ii) (Threaten Immediate Serious Bodily Injury).
[2] 18 Pa.C.S.A. § 903.

resided at the home. At the time, Ms. Kiger was separated from her husband, John[] Kiger (hereinafter "Mr. Kiger").

Appellant and Ms. Kiger work together for the Commonwealth of Pennsylvania in the Information Technology ("IT") Department, and had known each other for approximately eight (8) years at the time of the incident. Appellant and Ms. Kiger saw each other frequently outside of work because their daughters were on the same cheerleading squad. As a result, Appellant frequently visited Ms. Kiger's home. [The victim] met Appellant at a party Ms. Kiger hosted at her home in August of 2016.

At some point after [the victim] moved some of his belongings in the home, he and Ms. Kiger had a discussion about a budget and what each person's share of the household bills would be. They agreed that [the victim] would pay $400 a month for rent. However, [the victim] never paid Ms. Kiger.

In early September of 2016, [the victim] and Ms. Kiger began fighting and during the course of the fight, Ms. Kiger mentioned several times that [the victim] owed her $400 and she would be taking him to small claims court. The fight ended when Ms. Kiger told [the victim] to pack up his belongings and leave, which he did. Over the course of the next several days, Ms. Kiger and [the victim] were fighting via text messaging. Again, Ms. Kiger stated several times that she would take [the victim] to court for the $400 that she believed he owed her.

On September 9, 2016, Ms. Kiger sent a text message to [the victim] asking that he stop by her home to discuss the future of their relationship. [The victim] drove to her home after work, arriving between 6:00 P.M. – 7:00 P.M. [The victim] parked in the alley behind Ms. Kiger's home, as he always had, and tried to enter the back door to the residence, as he always had. However, he was surprised to find the back door locked. [The victim] went around to the front door, but it was locked as well. While walking back toward the alley, [the victim] ran into Ms. Kiger's daughter, Zoie, who went to the front door where Ms. Kiger opened it for her. Ms. Kiger greeted [the victim] warmly with a hug and invited him into the kitchen for coffee.

Approximately ten (10) minutes into their discussion, Ms. Kiger's demeanor changed. According to [the victim], "she was like, I'm about to do something now that will make sure you never fuck over another woman, and that's when she yelled 'Now.'" And then that was when [Mr. Kiger] and Appellant came out of the

basement. Mr. Kiger was holding a baseball bat and screaming at [the victim,] "how dare you steal from my family, I'll effing kill you." Ms. Kiger did not seem surprised by the ambush, and stood idly by watching. Appellant then patted [the victim] down and removed his vape box, keys, wallet, and cell phone [from his person]. [The victim] had approximately $180 in cash on him. However, Ms. Kiger was angry and said it was not enough money. Appellant and the Kigers began arguing about how they were going to get more money from [the victim]. Appellant suggested that they take [the victim] to an ATM to withdraw money.

After some discussion, the four (4) left the home and got into Ms. Kiger's Chrysler Town and Country van. Ms. Kiger was driving, [the victim] in the passenger seat, Mr. Kiger seated behind [the victim], and Appellant seated behind Ms. Kiger. Ms. Kiger drove to the Sheetz on Lindle Road in Swatara Township, and after parking, Appellant and the Kigers began arguing again about how they were going to force [the victim] into withdrawing money from the ATM. At some point during this process, [the victim] was given his wallet back and when the trio began arguing, he took the opportunity to jump out of the van and run into Sheetz. Mr. Kiger jumped out of the vehicle and chased [the victim] until he entered the store. [The victim] asked a clerk to call 911 stating that he had just been kidnapped and robbed. Ms. Kiger then came into Sheetz and told everyone that [the victim] was crazy, off his medications, and to not listen to what he is saying because he is lying. Ms. Kiger then left the store, got back into the van, and drove away.

Officer Ronald Soutner [] of the Swatara Township Police Department responded to the dispatch call. [The victim] testified that he told Officer Soutner what had happened, but felt the officer was treating him more like a criminal than a victim. According to Officer Soutner, during the interview of [the victim], it appeared as though [the victim] was more concerned about getting his stuff back. Therefore, Officer Soutner went to Ms. Kiger's residence and asked for [the victim's] possessions back. Ms. Kiger turned over [the victim's] vape box and keys, but refused to return [the victim's] phone because of the money he allegedly owed her. Officer Soutner returned to Sheetz and gave [the victim] his possessions back, minus his cell phone. [The victim] then asked for a ride back to his vehicle and Officer Soutner refused. Officer Soutner considered it to be a civil matter and closed out the call.

Once [the victim] returned to his vehicle, he was confronted again by Ms. Kiger who had her daughter Zoie in the vehicle. Ms. Kiger tried to block [the victim] in while yelling at him to get off her property. Once he returned to work, [the victim] called the Pennsylvania State Police ("PSP"), who directed him to contact the Steelton Police Department. Detective William Shaub [] of the Steelton Police Department was assigned to the case. He interviewed [the victim] and Zoie Kriger [sic], as well as obtained surveillance video from Sheetz. Appellant initially denied being at Ms. Kiger's residence on September 9, 2016, except to say that she was there to pick up her daughter. When confronted with what Detective Shaub had learned during his investigation, Appellant stated that she did not recall the events that occurred on September 9, 2016. She did not mention that she was forced to participate in the activity nor did she mention that she witnessed the Kigers commit a crime that she was not a part of.

Trial Court Opinion ("T.C.O."), 7/12/19, at 3-7 (citations omitted).

While Appellant was charged with Robbery, Conspiracy to Commit Robbery, Kidnapping, Conspiracy to Commit Kidnapping, Intimidation of a Witness, and Simple Assault, the Commonwealth chose to proceed to trial only on the charges of Robbery (Threaten Serious Bodily Injury) and Conspiracy to Commit Robbery.

After a two-day trial was held on January 17-18, 2019, the jury convicted Appellant of both charges. On March 19, 2019, the trial court sentenced Appellant to ten to twenty-three months of Dauphin County Prison work release, followed by three years of county probation. Appellant did not file a post-sentence motion, but instead filed a timely notice of appeal. Appellant then complied with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review on appeal:

- 4 -

I.      Was the evidence insufficient to sustain verdicts of guilty on robbery and conspiracy to commit robbery?

II.     Did the lower court err by refusing to give the jury a durress [sic] instruction at the request of Appellant?

III.    Did the lower court abuse its discretion by failing to sustain [Appellant's] objection pursuant to Batson v. [sic] when the Commonwealth struck all persons of color from the prospective jury?

IV.     Did the lower court abuse its discretion by overruling Appellant's objection to the Commownealth [sic] eliciting hearsay testimony from Zoie Kiger regarding what she was told following the robbery by an unnamed person?

Appellant's Brief, at 6 (reordered for ease of review).

We first analyze Appellant's claim that there was insufficient evidence to support her convictions for robbery and conspiracy to commit robbery. Our standard of review is as follows:

> "A claim challenging the sufficiency of the evidence is a question of law." **Commonwealth v. Widmer**, 560 Pa. 308, 744 A.2d 745, 751 (2000). We review a sufficiency challenge *de novo*, but our scope of review is limited to the evidence of record. **Commonwealth v. Robinson**, 128 A.3d 261, 264 (Pa. Super. 2015) (*en banc*).
>
> The Commonwealth must establish each element of the crimes charged beyond a reasonable doubt, but in so doing, it may rely on wholly circumstantial evidence. **Commonwealth v. Galvin**, 603 Pa. 625, 985 A.2d 783, 789 (Pa. 2009). The fact-finder, "while passing on the credibility of the witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." **Id.** "[A] reviewing court views all the evidence and reasonable inferences therefrom in the light most favorable to the Commonwealth." **Id.**

**Commonwealth v. Gomez**, 224 A.3d 1095, 1099 (Pa.Super. 2019).

Appellant was convicted of robbery under Section 3701(a)(1)(ii) of the Crimes Code, which provides that "a person is guilty of robbery, if, in the

- 5 -

course of committing a theft, he … threatens another with or intentionally puts him in fear of immediate serious bodily injury." 18 Pa.C.S.A. § 3701(a)(1)(ii). To prove the crime of conspiracy, the Commonwealth must show a defendant entered into an agreement to commit or aid in an unlawful act with another person, that he and that person acted with shared criminal intent, and that an overt act was taken in furtherance of the conspiracy. ***Commonwealth v. Feliciano***, 67 A.3d 19, 25-26 (Pa. Super. 2013) (en banc); 18 Pa.C.S.A. § 903.

Further, with respect to the crime of conspiracy, this Court has provided:

> [t]he essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.

***Commonwealth v. Johnson***, 180 A.3d 474, 479 (Pa.Super. 2018) (quoting ***Commonwealth v. Murphy***, 792 A.2d 1025, 1038 (Pa.Super. 2002) (citation omitted)).

Appellant argues that there was "simply … not enough [evidence] to prove, beyond a reasonable doubt, that Appellant was a meaningful participant in a robbery or conspiracy, and that she was not acting under duress." Appellant's Brief, at 29. Appellant argues that she played only a "*de minimus* role" in the robbery by patting the victim down, did not benefit from any of the crimes committed, and was "at the mercy of Josephine Kiger, the instigator of the crime, and John Kiger, the aggressor." ***Id***. at 28.

We reject these claims as the record contains ample evidence that Appellant and Kigers planned to threaten the victim with serious bodily injury in order to obtain money from the victim. On the date in question, Ms. Kiger lured the victim to her residence to talk to him about the future of their relationship, while Mr. Kiger and Appellant waited in the basement. After the victim and Ms. Kiger had a brief discussion, Ms. Kiger's demeanor changed and she signaled for Mr. Kiger and Appellant to come out of the basement into the kitchen. While Mr. Kiger threatened victim by yelling and swinging a baseball bat, Appellant patted the victim down for weapons and took the victim's wallet, cell phone, keys, and vape box.

In addition, when Ms. Kiger was unsatisfied with the amount of money that she obtained from the victim's wallet, Appellant proposed that they take the victim to an ATM and force him to withdraw additional cash. Appellant accompanied the Kigers as they transported the victim to an ATM at the nearby Sheetz gas station.

Moreover, there is no evidentiary basis to support Appellant's suggestion that she acted under duress due to fear of the Kigers. The Crimes Code defines the defense of duress as follows:

(a) General Rule. – It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.

(b) Exception. – The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

18 Pa.C.S.A. § 309.

As noted above, when Appellant initially spoke to the police, Appellant claimed she was not present when the victim was confronted by the Kigers. Once Appellant learned the police had obtained information about the incident, Appellant admitted she was at Ms. Kiger's home during the conflict but could not remember what happened. At no point did Appellant tell the police that she was coerced to participate in a crime by the Kigers.

While Appellant claimed at trial that she was "scared" when the Kigers confronted the victim to the point where she "lost all senses," Appellant willingly frisked Appellant and took his personal belongings. Further, we agree that Appellant had ample opportunity to remove herself from the situation and did not do so when she accompanied the Kigers to a nearby Sheetz to force the victim into withdrawing more money from the ATM. Despite Appellant's

claim that she had been coerced into participating in a robbery, Appellant admitted that she decided to "tag[] along" with the Kigers as they brought the victim to Sheetz as Appellant wanted to get a slushie. Notes of Testimony ("N.T."), 1/18/19, at 221. However, Appellant explained that she did not go into Sheetz as she did not have her wallet. *Id*. at 221-22.

As indicated above, the jury, as factfinder, was free to believe all, some or none of Appellant's testimony. *Gomez*, *supra*. In reviewing the evidence in the light most favorable to the Commonwealth as verdict winner, we agree with the trial court's conclusion that there was sufficient evidence to sustain Appellant's convictions for robbery and conspiracy.

Second, Appellant claims that the trial court erred in refusing to give her requested jury instruction on duress.

> it is well-settled that "the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties, and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal."
>
> *Commonwealth v. Wise*, 171 A.3d 784, 787-88 (Pa. Super. 2017) (citations and brackets omitted), *appeal denied*, ––– Pa. ––––, 186 A.3d 939 (2018). A defendant "may not claim entitlement to an instruction that has no basis in the evidence presented during trial." *Commonwealth v. Hairston*, 624 Pa. 143, 84 A.3d 657, 668 (2014) (citation omitted).

*Commonwealth v. Soto*, 202 A.3d 80, 98–99 (Pa.Super. 2018).

As explained above, the trial court concluded that the totality of the circumstances did not support Appellant's claim of duress as her testimony did not show she was subjected to coercion that was of "such a nature that a

person of reasonable firmness in [Appellant's] situation would have been unable to resist it." N.T., 1/18/19, at 240. As such, the trial court did not err in refusing to give Appellant's requested jury instruction on duress which had no basis in the evidence presented at trial.

Third, Appellant claims the trial court abused its discretion by failing to sustain Appellant's **Batson** motion, in which she argued that the prosecution improperly used four peremptory strikes to exclude four individuals of color from the jury.[3] We are guided by the following principles:

> A **Batson** claim presents mixed questions of law and fact. Therefore, our standard of review is whether the trial court's legal conclusions are correct and whether its factual findings are clearly erroneous.
>
> In **Batson**, the [Supreme Court of the United States] held that a prosecutor's challenge to potential jurors solely on the basis of race violates the Equal Protection Clause of the United States Constitution. When a defendant makes a **Batson** challenge during jury selection:
>
>> First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.
>
> **Commonwealth v. Edwards**, 177 A.3d 963, 971 (Pa. Super. 2018) (citations and quotation marks omitted). "The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent or engaged in purposeful discrimination." **Commonwealth v.**

---

[3] **Batson v. Kentucky**, 476 U.S. 79, 106 S.Ct. 1712 (1986).

> ***Towles***, 630 Pa. 183, 106 A.3d 591, 602 (2014) (citation omitted). This Court must give great deference to a trial court's determination that peremptory challenges were free of discriminatory intent, and we will not overturn the determination unless it was clearly erroneous. ***See id.***

***Commonwealth v. Scott***, 212 A.3d 1094, 1105–06 (Pa.Super. 2019).

In this case, the trial court agreed that Appellant had established a *prima facie* case of purposeful discrimination by pointing out that the Commonwealth had used peremptory strikes to exclude four individuals of color from the jury and noting that Appellant is African-American.

The trial court required the Commonwealth to explain its reasoning for striking each of these jurors. The prosecutor first stated that he struck juror number 169 because "[i]t was the impression of the detective sergeant and myself that she appeared to be disinterested and wasn't paying attention to the voir dire." N.T., 1/17/19, at 59. The trial court also noted that the prosecutor also appeared to be unaware that juror number 169 identified as a person of color. ***Id***.

In addition, the prosecutor explained that he struck juror numbers 138 and 223 due to their respective prior arrest and/or convictions for possession of marijuana and driving under the influence (DUI). Lastly, the prosecutor indicated that he struck juror number 200 who shared that his brother-in-law is the Chief Public Defender in Cumberland County.

Based on this record, the trial court concluded that Appellant did not prove purposeful discrimination as that the prosecution was able to offer race-neutral explanations for striking each of the potential juror. As Appellant failed

to show that the trial court's factual findings were clearly erroneous or that its legal conclusion was incorrect, this claim is meritless.

Appellant also claims the trial court abused its discretion by overruling her objection claiming the prosecutor improperly elicited hearsay testimony from Commonwealth witness, Zoie Kiger (hereinafter "Zoie"), the Kigers' daughter. Zoie testified that she had witnessed part of the confrontation between her parents and the victim. Zoie recalled that her mother, Ms. Kiger, was angry with the victim as she believed that he owed her money for rent. Zoie observed her father, Mr. Kiger, yelling and holding a baseball bat. Zoie recalled that Appellant was present during this altercation.

On direct examination, the prosecutor asked Zoie if she was "told in the presence of [Appellant] by either [Appellant] or your mom or your dad that you shouldn't say anything about this?" N.T., 1/17/19, at 153-54. Defense counsel made two objections, in which he argued that the prosecution was eliciting hearsay. The trial court overruled the objections on the basis that it believed that Zoie was testifying to a verbal act and asserted that her statement was not being used for the truth of the matter. Zoie then testified that while in the presence of the Kigers and Appellant, she was told not to talk about the incident involving the victim.

In a similar case, **Commonwealth v. Johnson**, 576 Pa. 23, 838 A.2d 663 (2003), our Supreme Court concluded that the trial court did not err in permitting a witness to testify concerning statements the defendant made in

an attempt to influence the witness, as this testimony was admissible as non-hearsay verbal act testimony. The Supreme Court explained:

> This Court has long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt. ***See, e.g., Commonwealth v. Johnson***, 542 Pa. 384, 398–99, 668 A.2d 97, 104 (1995) (concluding that a witness's testimony that a defendant offered him a bribe not to testify at trial was admissible to show the defendant's consciousness of guilt); ***Commonwealth v. Goldblum***, 498 Pa. 455, 472, 447 A.2d 234, 243 (1982) (citing cases for the proposition that the Commonwealth may demonstrate consciousness of guilt through attempts by a defendant to intimidate *or influence* a witness). Here, regardless of whether or not Johnson's statements constituted threats, it is apparent that they were intended to influence Cook's testimony at trial. Accordingly, they are relevant. Although the evidence was adduced via the testimony of a non-declarant listener, courts generally admit such statements (subject to an assessment of probative value versus prejudicial impact) as verbal acts, a form of nonhearsay. ***See, e.g., Tompkins v. Cyr***, 202 F.3d 770, 779 n. 3 (5th Cir. 2000); ***United States v. Thomas***, 86 F.3d 647, 653 n. 12 (7th Cir. 1996); ***United States v. Pate***, 543 F.2d 1148, 1149 (5th Cir. 1976). This is so, because the evidence is not offered to establish the truth of the matter asserted…, but rather, to demonstrate the fact of the attempted influencing. ***See id.*** Moreover, influential statements by third parties have been admitted on identical grounds where, as here, the defendant is aware of and authorizes the statements. ***See generally*** 29A AM.JUR.2D EVIDENCE § 809 (2003); ***accord United States v. Miller***, 276 F.3d 370, 373–74 (7th Cir. 2002) (finding that threat against potential witness by person connected with the defendant in several ways was admissible to show the defendant's consciousness of guilt).

***Johnson***, 576 Pa. at 51-52, 838 A.2d at 680.

Similarly, in this case, the trial court allowed Zoie to testify that she was told not to testify about the incident involving Appellant, the Kigers, and the victim. The prosecution offered this testimony not for the truth of the matter

asserted, but to show that Appellant and the Kigers attempted to influence Zoie, a witness to the crimes at issue in this case.

Alternatively, Zoie's statement was admissible under Pennsylvania Rule of Evidence 803(25)(E), entitled "Admission by Party Opponent," which allows for the admission of a statement against a party if the statement is made by the "co-conspirator of a party during the course and in furtherance of the conspiracy." Pa.R.E. 803(25)(E).

In **Commonwealth v. Coccioletti**, 493 Pa. 103, 425 A.2d 387 (1981), our Supreme Court found that testimony concerning the declarations of two co-defendants fell within the Pennsylvania co-conspirator exception to the hearsay rule. In that case, co-defendants Coccioletti and Garrity, who were inebriated, fired gunshots across a road through traffic and killed the driver of passing truck. After the incident, the co-defendants were traveling with a friend in a car when Coccioletti admitted remorse for their crimes and began to concoct an explanation for their possession of the firearms. At trial, Coccioletti and Garrity objected to the admission of the friend's testimony, who testified that he overheard this conversation. The Supreme Court provided the following:

> [i]n Pennsylvania, the out-of-court declarations of one co-conspirator can be admitted against another co-conspirator provided that the declarations were made during the conspiracy and in furtherance of the common design.... This Court has extended the co-conspirator exception to admit declarations by "co-participants" in a crime even where conspiracy has not been charged or proven. Appellants were co-participants in the crime: this has been established.... The declarations were made in the course of concealing evidence and in furtherance of [the] common

- 14 -

design of evading capture. Although the co-conspirator exception ... has not been applied when the declarations are made after arrest and termination of the conspiracy, the appellant's [sic] declarations in this case were made prior to their arrest while the conspiracy was still in progress.

*Id*. at 113, 425 A.2d at 392 (citations omitted). *See also Commonwealth v. Gribble*, 580 Pa. 647, 666–67, 863 A.2d 455, 466 (2004) (finding inculpatory statement made by co-conspirator was admissible when it was made during this course of the conspiracy prior to his arrest for the target crime).

In this case, Zoie testified that, while in the presence of Appellant and her parents, she was instructed not to talk to anyone about their confrontation with the victim. This statement was made before Appellant and the Kigers were arrested for the crimes at issue and while the conspiracy was still in progress. Moreover, this statement was also made in furtherance of concealing the crimes and evading capture. As a result, the trial court did not err in overruling Appellant's objection to this testimony.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>06/01/2020</u>

- 15 -